MASSACHUSETTS MUT. LIFE INS. CO. (DAVIS v.). See Case No. 3,642.

MASSACHUSETTS NAT. BANK (FISKE v.). See Case No. 9,857.

MASSACHUSETTS NAT. BANK (MATTHEWS v.). See Case No. 9,286.

MASSACHUSETTS NAT. BANK (MORSE v.). See Case No. 9,857.

---

## Case No. 9,260.

### The MASSASOIT.

[1 Spr. 97; 7 Law Rep. 522; 12 Hunt, Mer. Mag. 367.] [1]

District Court, D. Massachusetts. Dec., 1844.

SEAMEN — WAGES — SHIPWRECK — REMNANTS OF VESSEL SAVED—OFFICERS AND SEAMEN SUPERSEDED BY OWNER IN SALVAGE.

1. In case of shipwreck, seamen are entitled to wages, as such, if by their exertions remnants of the vessel to the amount of the wages are saved, although no freight be earned.

[Cited in The Holder Borden, Case No. 6,600; Drew v. Pope, Id. 4,080.]

2. If, after a vessel is cast on shore, the owner appears with a competent force, supersedes the officers, and takes the business of salvage out of the hands of the seamen, and neither affords them subsistence, nor desires their aid, they being willing to render it, they may recover wages in a suit in rem against the remnants of the vessel.

This was a libel for wages in a voyage from Calcutta to Boston.

Richard H. Dana, Jr., for libellants.

Sidney Bartlett, for respondents.

SPRAGUE, District Judge. If no freight was earned, the first question is, whether in case of shipwreck and total loss of freight, parts of the vessel being saved by the exertions of the crew, the seamen are entitled to wages. When the early editions of Abbott on Shipping were published, there had

---

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission. 12 Hunt, Mer. Mag. 367, gives only a partial report.]

been no decision on this point in England. Abb. Shipp. (3d Ed.) p. 435.

In the American courts it has been settled, by a series of decisions commencing at an early date, that in such case the seamen are entitled to compensation. Should that compensation be wages under the contract? This was opposed to the maxim, that "freight is the mother of wages," which the courts were not prepared directly to encounter. Should the compensation be salvage? Salvors are mere volunteers, and very liberal compensation is awarded to them, in order to invite their exertions and secure their fidelity, in the laborious and oftentimes perilous service of rescuing and preserving wrecked property. Shall then seamen be absolved from the obligations of their contract, and from all duty of obedience to their officers, at the moment when their services may be most needed, for the protection of the property of the owners? Shall they be at liberty, at such a time, to divest themselves at once of their allegiance to the ship, and of the character of covenanted seamen, and assume, at their option, the character of salvors, claiming its large rewards, and subject to no control? This would not only be inconsistent with the contract of hiring, but a startling violation of that principle of maritime policy, which sedulously endeavors to bind up the interest of the mariner with that of the owner. It would be not only an inducement to relax his efforts in time of difficulty and danger, but a direct temptation to cause shipwreck and disaster, that he might successfully claim the large rewards of salvage service.

There may, indeed, be cases in which seamen may become salvors of their own vessel, as stated by Lord Stowell in The Neptune, 1 Hagg. Adm. 227, 237; and by Mr. Justice Story more liberally, in The Two Catherines [Case No. 14,288]; and as in Mason v. The Blaireau, 2 Cranch [6 U. S.] 240, 269, 270; although that was against the judgment of that able jurist, Mr. Justice Washington, as appears in The Cato [Case No. 13,786]. But seamen can properly become salvors only in very extraordinary cases, where the services rendered are without the range of their contract, and therefore voluntary. Of such we are not now speaking.

The objections to seamen becoming salvors, in ordinary cases of shipwreck, are so formidable, that the idea could not be entertained; and it was decided that they were still held by their contract, and bound to continued exertions to save their ship, her tackle, apparel, and fragments. That for such laborious and hazardous service, when successfully performed, they should receive some reward, no one was bold enough to deny. It could not be salvage, for the insurmountable objections already stated. Should it be a quantum meruit? That was incompatible with the idea, that the serv-

ice was rendered under a contract prescribing the rate of compensation, and was obnoxious, in a great degree, to the objections which excluded salvage.

Holding, as the courts generally did, and upon the strongest reasons, that the seaman was still serving under the obligation of his contract, the plain principle would seem to be that his compensation should be that which the contract prescribed. And this was the practical result to which they in fact generally came, although they did not see fit to give it the name of wages. They have called it sometimes salvage measured by the stipulated wages, sometimes quasi salvage, or wages in the nature of salvage. But the compensation actually given was the contract wages, neither more nor less; and this, too, whether the voyage had been long or short, the amount large or small, or the service, at the time of the shipwreck, great or trifling. It had not one quality of salvage, excepting that something must be saved. It was not for voluntary, but for covenanted service. It was not enhanced by peril and gallantry, nor diminished by the object being easily and safely accomplished. It was not affected by the value of the property saved, provided it was not less than the amount of the wages. It might exhaust the whole remnants, where there had been little either of peril or labor; or it might not take a hundredth part, where both had been great. Decisions of Judge Winchester, reported in a note in Relf v. The Maria [Case No. 11,692]; Frothingham v. Prince, 3 Mass. 563, more fully reported in 2 Dane, Abr. 462; Weeks v. The Catharina Maria [Case No. 17,351], which states what was the ultimate decree in The Cato [supra]; Giles v. The Cynthia [Case No. 5,424]; Clayton v. The Harmony [Id. 2,871], a remark arguendo; Coffin v. Storer, 5 Mass. 253, 254, a dictum; The Two Catherines [supra]; Adams v. The Sophia [Case No. 65]; Brackett v. The Hercules [Id. 1,762]. In Dunnett v. Tomhagen, 3 Johns. 156, the court, by Kent, C. J., considers the compensation that should be awarded, to be salvage; and the same opinion is expressed in 3 Kent, Comm. 195.

It will be seen by these cases, that while judges and jurists were really carving out a new exception from the general rule, that makes the earning of freight a pre-requisite to the recovery of wages, they had the fear of the maxim that "freight is the mother of wages," before their eyes, and sought to propitiate it by a misnomer. That maxim is probably indebted to the concise figure of speech in which it is conveyed, for something of its force and acceptance; for, as observed by Lord Stowell, in The Neptune [1 Hagg. Adm. 227], it is not strictly accurate. Wages are the legitimate offspring of the mariner's contract united with its performance,—cut off, indeed, sometimes by the stern decrees of maritime policy, seeking to unite the interest of the mariner with that of the owner.

Chancellor Kent, in Dunnett v. Tomhagen, and in his Commentaries above cited, expressed dissatisfaction with this equivocal state of judicial opinion, in which the language of the courts vibrated between wages and salvage; and to escape from it, he adopted the greater evil of considering that the reward should be strictly and merely salvage. Mr. Justice Story, in The Two Catherines [supra], says, "If the question were entirely new, it might, perhaps, be more consistent with the principle of the rule, that the earning of wages shall depend on the earning of freight, to hold that the case of shipwreck constituted an exception from the rule; and that the claim to wages was fully supported by the maritime policy, on which the rule itself rests."

What was thus clearly indicated in 1821, as the most proper course, and the course which Judge Story would evidently have pursued, but for the influence of previous opinions pronounced by others, was fully adopted by Lord Stowell, in The Neptune, 1 Hagg. Adm. 227. The case was this: A British vessel was wrecked on the coast of France, and the freight totally lost, but by the exertions of the crew, parts of the vessel were saved, which were sold by the captain, who was also the owner. After their return to England, the seamen instituted a suit in personam, in the admiralty, against the owner, for wages. The libel or petition contained no claim for salvage, or quasi salvage, services. Lord Stowell, after full investigation, in an elaborate judgment, sustained the naked claim for wages as such, distinctly announcing it as an exception to the rule, which makes wages to depend on freight. This is evidently approved by the American editor of Abbott on Shipping (4th Am. Ed., p. 452); and again by the same high authority, in Pitman v. Hooper [Case No. 11,185]; and we may now, with that directness which should characterize courts of justice, give to the established practice in this country its true designation, and say that in such cases wages, as such, are recoverable.

The result of the authorities, and the true doctrine, are well stated in Curt. Merch. Seam. pp. 285–290; where the learning on this subject is collected.

But it is contended that, in the case now before the court, the seamen did not save the remnants of the vessel; that they were preserved by other agency, and that this distinguishes the present case from all cases in which compensation has been allowed, and ranges it with that of The Elizabeth and Jane [Case No. 4,356].

What are the facts? The ship Massasoit, on a voyage from Calcutta to Boston, went ashore in a storm on the night of Wednesday, the 11th of December last, on Point Alderton, at the mouth of Boston harbor. The crew remained on the wreck, performing all their duties, until they were taken off by a life-boat. barely escaping with their lives, about three o'clock

in the afternoon of Thursday. Previously to this, the owners had received information of the disaster, and at the time when the seamen were landed, the agent of the owners arrived with a steamboat from Boston, for the purpose of saving the remnants of the vessel and cargo. From that time, the captain gave up all control to the agent. The crew were in a suffering condition, and physically unable to perform any labor, during the residue of Thursday. On Friday, some of them were still too feeble to do anything; the others went upon the beach, near the wreck, and rendered some trifling service, by throwing out of the reach of the sea a few sheets of copper, that had been torn by the waves from the bottom of the ship. The agent continued to labor in saving the wreck, until Tuesday following, and then contracted with certain persons to take up the cables and anchors, when the sea should become smoother; which was done in the succeeding week. Neither the agent of the owners, nor the officers of the ship, furnished the seamen with any means of subsistence, or called on them for any service, or indicated in any manner, that their aid was desired.

The seamen never formally tendered their services, but no disinclination was manifested, on their part, to perform whatever services might be required of them. They remained, supported by charity, near the wreck; their presence and condition being known to the agent and officers, until Saturday, when they went to Boston.

The admiralty requires no vain or nugatory acts, and a formal and express offer of service was not necessary. Had the agent desired their aid, he would doubtless have made it known, and furnished them the means of subsistence, which might easily have been done. Instead of this, he came with a steamer, and as great a force of efficient men as he chose to take with him, and it was in his power, before Friday morning, to have increased that force to any desired extent. I must presume, therefore, that he had all the assistance that he wished, and the seamen being thus superseded, and the saving of the remnants taken out of their hands, might well consider themselves discharged, and, after remaining near the wreck about forty hours on charity, seek the means of subsistence elsewhere.

Why should they not have wages? Such performance would, upon the principles applicable to other contracts of hiring, entitle them to the stipulated reward. That policy which makes the compensation of the seaman depend on his saving property, entrusted to his care, for the owner, was intended to secure his fidelity, and stimulate his exertions in case of disasters, which usually occur at sea, or in remote countries, where the owners cannot be present; and oftentimes where none but the crew can know how far their duty has been fully performed. Here the owner appeared; all control over the property was delivered up to him, he assumed the entire management, superseded the seamen, took the

business of the salvage out of their hands, and in effect, discharged them. Surely the stern rule of maritime policy, which has been adopted to stimulate continued exertions for the benefit of the owner, has no application to a case like this; and the just principles which usually govern contracts for labor need not be intercepted.

This differs from the case of The Elizabeth and Jane [supra]. There the vessel had been entirely abandoned,—left derelict by the crew. It had not been delivered up to the owner. He had never appeared. In such cases it is often difficult, sometimes impossible, to ascertain whether more could have been done or not; and the policy of making it for the interest of the crew to persevere, by saying to them, when you abandon the vessel, you abandon all hope of compensation, is manifest; and the accidental circumstance that the derelict is afterwards found by others and brought to the owners, burdened with heavy salvage, does not affect the justice or policy of the case, nor resuscitate the claim to wages.

Decree for wages and costs.

NOTE. Since the decision of The Massasoit the point there adjudicated has been considered, incidentally, in several cases reported in the United States. Davis v. Leslie [Case No. 3,-689]; The John Perkins [Id. 7,360]; Bruce v. The America [Id. 2,046]. And some decisions prior in date to The Massasoit have since been reported: Cartwell v. The John Taylor [Id. 2,-482]; Reed v. Hussey [Id. 11,646]; The Wave [Id. 17,300]; The Dawn [Id. 3,666]. In this last case, (previously reported in the American Jurist,) Ware, J., after a very careful examination of the authorities, expressed the opinion, "that the seamen, in these cases, have two distinct claims, one for wages, and another for salvage. Their wages are to be paid exclusively from the materials of the ship, they being pledged for that purpose, and the full amount due is to be paid without deduction. But they have no claim for wages against the cargo, except for the freight due upon it. Their claim for salvage is against the general mass of the property saved; and, as in all cases of salvage, the amount is uncertain, depending upon the particular circumstances of the case." The learned judge goes on to say, that "the crew are bound to remain by the vessel, and contribute their utmost exertions to save as much as possible from the wreck." Their service, therefore, wants one essential element of salvage service.—that of being voluntary. And the conclusion finally arrived at is, that they are not to be rewarded as general salvors, but are to be allowed, in addition to wages, "a reasonable compensation, pro operâ et labore."

It has been said by eminent authorities, that "it matters not whether the recompense be made in the name of wages, or as salvage." Reed v. Hussey [supra]; 3 Kent, Comm. 196, note; but there are cases where the compensation wholly depends on this distinction, as for example, where the ship perishes, and cargo alone is saved, with no freight due upon it.

In England, the exception contended for in The Massasoit, has been established both by the courts and by legislation. The next case to The Neptune, before the high court of admiralty, was The Reliance, 2 W. Rob. Adm. 119. There was a total loss of cargo and freight; the ship perished, and the crew in her, but portions of the ship were saved by strangers, and came into the owner's hands. The widow and administratrix of one of the crew, promoted a suit for his wages against the owners. The learned

judge, (Dr. Lushington,) decreed wages to the time of the seaman's death. In the next year after this decision, (Sept. 5. 1844,) was passed 7 & 8 Vict. c. 112, § 17: that "in all cases of wreck or loss of the ship, every surviving seaman shall be entitled to his wages up to the period of the wreck, or loss of the ship, whether such ship shall, or shall not, have previously earned freight; provided the seaman shall produce a certificate from the master or chief surviving officer of the ship, to the effect that he had exerted himself to the utmost to save the ship, cargo and stores." And in 1854, was passed the 17 & 18 Vict. c. 183: that "no right to wages shall be dependent on the earning of freight;" with the proviso that in all cases of wreck, or loss of the ship, proof that the seaman has not exerted himself to the utmost to save the ship, cargo and stores, shall bar his claim. "A most wise and salutary substitute," says Judge Betts, Davis v. Leslie [supra], for the first statute, "for that old figment of law, which had, in many cases, been most oppressively enforced against seamen, that freight is the mother of wages."

In the year 1849, the gentleman who had acted as proctor for the libellants, in The Massasoit, filed a libel in the district court for Massachusetts, on behalf of certain seamen belonging to the ship Niphon, against the owners, for wages. The libellants were on monthly wages, when the ship was abandoned at sea, on account of a dangerous leak, and set fire to, by the master's orders. They claim wages to the time of the abandonment, on the ground that the seaman's contract is a simple contract of hiring, and that his title to wages depends only on his faithful performance of the service for which he is engaged. Sprague, J., dismissed the libel in a judgment not reported: and upon appeal to the circuit court, the decree was affirmed. See The Niphon's Crew [Case No. 10,277].

In The Florence (May 14, 1852) 20 Eng. Law & Eq. 607, where the seamen, by the master's order, abandoned a leaky ship, at sea, saving nothing of ship, or cargo, Dr. Lushington said, "Their right to wages was gone, and would have been, if a year's wages had been due them." In an action for salvage, brought by certain of the crew, who subsequently returned and saved the ship, he allowed the claim; on the ground that by the peculiar circumstances of the case, their contract, as seamen, had been terminated; and they might well be salvors. See, also, The Riby Grove, 2 W. Rob. Adm. 52; The Robert and Ann, Holt, Rule of Road, 55; The Isabella, 3 Hagg. Adm. 427; Hawkins v. Twizell, 34 Eng. Law & Eq. 195; Worth v. Mumford [1 Hilt. 1]; Hobart v. Drogan, 10 Pet. [35 U. S.] 122; Collins v. Hathaway [Case No. 3,014].