## THE DRILL BOAT NO. 4.

### (District Court, D. Massachusetts. March 31, 1916.)

### No. 776.

1. SHIPPING ☞207 — LIMITATION OF LIABILITY — UNSEAWORTHINESS — IMPROPER MANNING.

   Petitioner, under a contract with the government to blast ledges in Boston Harbor, had a drill boat stationed over a ledge in the center of the channel. One night, when the boat was not being operated, but was in charge of two watchmen, some of the spuds by which it was held became jammed in the housings as the tide fell, and, the watchmen being unable to free them, it overturned and sank. The watchmen left in a scow which was alongside, and which was brought back in the morning by a boat which picked them up, did nothing to mark the wreck, nor did the day crew, which came out, and after 8 o'clock a steamer entering the port came into collision with the wreck and was severely damaged. There were 26 feet of water over the ledge, and vessels of moderate draft gave it no attention while navigating the channel. The watchmen were mechanics, but not seamen. *Held*, that the boat was unseaworthy, because improperly manned, and that because of such fact, and also because of the failure of petitioner to at once mark the wreck, it was not entitled to a limitation of liability.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 555, 643, 644; Dec. Dig. ☞207.]

2. COLLISION ☞109—LOSS OF VESSEL—DUTY OF CREW TO MARK WRECK.

   It is the duty of the crew of a vessel which sinks in a harbor channel to take reasonable precautions to prevent injury to their own and other vessels from collision with the wreck.

   [Ed. Note.—For other cases, see Collision, Cent. Dig. § 232; Dec. Dig. ☞109.]

3. NAVIGABLE WATERS ☞24—WRECK—DUTY OF OWNER TO MARK.

   The duty to immediately mark the position of a sunken vessel, imposed by Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (Comp. St. 1913, § 9920), is

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

a personal duty of the owner, which cannot be delegated, so as to relieve him from responsibility.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 66; Dec. Dig. ☞24.]

In Admiralty. Petition by the Great Lakes Dredge & Dock Company, as owner of Drill Boat No. 4, for limitation of liability. Petition denied.

C. E. Kremer, of Chicago, Ill., Fitz Henry Smith, Jr., of Boston, Mass., and Frank S. Masten, of Cleveland, Ohio, for petitioner.

Edward S. Dodge, of Boston, Mass., and Benjamin Thompson, of Portland, Me., for damage claimant.

MORTON, District Judge. These proceedings arise out of a collision between the steamship Massachusetts, belonging to the damage claimant, and a sunken drill boat, belonging to the petitioner for limitation of liability. The accident occurred in Boston Harbor, a short distance above Spectacle Island, about 18 minutes after 8 in the morning, on July 5, 1913. The facts are as follows:

[1] The Great Lakes Dredge & Dock Company, which will be referred to as the Dredge Company (or as the petitioner), had a contract with the United States for the removal of ledges in Boston Harbor. Under this contract it had, about two weeks before the accident, put to work drill boat No. 4 at the place where the accident occurred, on ledge numbered 20 on the government dredging charts. This ledge lies about in the center of the full width of the channel, which at that point is something over one-quarter of a mile wide; it is just at the eastern edge of the 35-foot channel, near red gas buoy No. 4. There had, for many years, been 26 feet of water upon it, and vessels of moderate draft paid no attention to its existence. As to them, it was not an obstruction, and they frequently, if not generally, passed over it when running on the upper Spectacle Island range, the government lights for which were maintained until July 15, 1913.

Drill boat No. 4 was about 130 feet long and about 35 feet wide, a square float, divided into five water-tight compartments, and carrying on its deck a boiler, drilling machinery, and other apparatus. It was comparatively new, and seems to have been as good a boat of its kind as was then in existence. Its mechanical equipment and furnishings throughout were sufficient and in good order. It was held in place by four "spuds," one near each corner. These were straight beams of iron, which slid vertically in housings or guides attached to the hull. They had heavy iron feet, and each weighed about 12 tons. They were raised and lowered by steam engines, one to each spud, which, through multiplying gearing, operated pinions that engaged a rack fastened to the spud. From each corner of the boat a kedge anchor was run in a diagonal direction.

The spuds rested continuously on the bottom to hold the boat in place. As the tide in Boston Harbor had, at the date in question, a rise and fall of about 10 feet, it is evident that some means had to be provided for permitting the boat to slide up and down on the spuds. This was done by leaving a little steam on the engines, with the valve

gear so set as to turn them in the direction in which the tide was moving; i. e., up or down. The valve gear had to be shifted each time the tide turned; in other respects the arrangement worked automatically. Spuds are an effective device for holding a drill boat in position; there was, so far as appears, no other or better way of accomplishing that result. The use of them is attended, however, by this risk: If at the top of the tide, two spuds happen to rest upon rocks which slant outward, and the spuds settle down hard on these slanting rocks, then, as the boat falls with the tide, these spuds may get caught in their angular positions and jam in their housings. The jammed spuds hold up the end or side of the boat on which this occurs; and it does not go down with the water, while the opposite end or side continues to do so. This at first causes the boat to tilt over on the caught spuds, and eventually, if the tide drops far enough, to upset completely. It is an accident which has not happened often; but the possibility of it in vessels secured by spuds, like dredges or drill boats, in tidal waters, is well recognized.

In the usual operation of the drill boat, holes were drilled in the ledge, which were then charged with dynamite and exploded. The dynamite was carried in two small scows, which were used with the drill boat and were customarily moored to it. After the work of blasting had been completed, the drill boat would be moved away, and a dredge would be used to raise the shattered rock, and put it into scows for removal. No special dredge was used with any particular drill boat. A copy of the contract between the petitioner and the United States is annexed to the answers to the interrogatories. It provides for payment by the cubic yard.

No work was done by drill boat during the daytime on the 4th of July, nor on the night of July 4–5. The crews did not live aboard, but went ashore at the end of each period of work. About 6 p. m. on the 4th, the night crew came aboard the drill. It consisted of two men, Folz, who acted as watchman and mechanic, and Murphy, who acted as fireman. It was Folz's duty to attend to all matters on deck and to look after the safety of the boat. It was Murphy's duty to keep steam on the boiler and to do such other things as Folz might direct. High water occurred about midnight. About 1 o'clock Folz, who was working inside the house, noticed that the boat had taken a pronounced list. He went on deck and discovered that two of the spuds had caught as above described, and that the front side of the boat was not going down with the tide and was already 14 or 15 inches higher than it ought to be. He at once put steam on the engines and tried to draw up the spuds in question in order to relieve the boat. He was unable to start them and called Murphy to his assistance; they worked with bars, and were still unable to do so. During this time the back side of the boat was settling with the tide, and the whole boat was tilting more and more.

They did not succeed in releasing the spuds. Finally the tilt became so great that they were afraid of an immediate upset. Thereupon they hastily left the drill boat and went on one of the powder scows. One of the two ropes which held the scows to the dredge was cut by

them. There was a small boat fastened to one of the scows, the oars for which had been on the deck of the dredge, but were not taken by the two men; there was, however, one oar in the boat. There were lanterns and plenty of ropes on the dredge. All the appliances necessary to hold to the drill boat, to mark it if it should go down, or to get assistance, were at hand. Several minutes later, the drill boat upset completely and went to the bottom. At this time the last rope holding the scows to it broke, the men made no effort to hold to the wreck, and the scows and the rowboat drifted off with the men down the harbor. This happened not later than 2 a. m. It was a clear and quiet summer night. Castle Island was about one-half a mile off, Governor's Island about three-quarters of a mile, and Spectacle Island about a mile, with the tide flowing in that direction. Assistance could probably have been obtained at any of these places, but the two men made no effort to reach them.

There were many projecting pipes and appliances on the drill, and in its unlighted condition it constituted during the rest of the night a menace to navigation of the most dangerous character, against which Folz and Murphy made no effort to protect other vessels. About half past 3 that morning the tug Sadie Ross found the two scows and the men on them in the outer harbor and towed them up past the place where the wreck lay. At this time, parts of it were visible above the water. It would have been an easy matter for the Ross to have fastened the scows or a boat to it as a warning; but no request to do so was made by Folz or Murphy. They were taken by the Ross to drill boat No. 8, also belonging to the petitioner, in the upper harbor, and were left there with the scows at about 5:30 a. m.

[2] About 6 a. m. the Boston police boat, which had been notified of men adrift in the harbor, and had later been informed that the men had been picked up and taken to drill boat No. 8, went to that boat and inquired if the men were there. An affirmative answer was given, but no request was made that the police should place warnings or markers at the wreck. About the same time the day crew of No. 4 started from shore to go out to it. They discovered soon after leaving shore that it had sunk; but they kept on, and, passing by the location of the wreck, went on to drill boat No. 8, arriving there about 6:20 a. m. Hancock, the foreman of No. 4, was in this gang. He testified that he looked at the wreck from No. 8, and concluded that certain pipes which he saw projecting above the surface sufficiently marked it to warn other vessels. He made no effort to mark it further, although he could very easily have done so. He went back ashore with his men and hunted up Mr. Williams, the general superintendent of the petitioner's operations around Boston, whom he informed of the accident. Mr. Williams, without taking steps to have the wreck marked, at once set about making arrangements to have the drill boat raised. He made only a casual examination from a distance as to whether enough of her was showing, and would continue to show as the tide rose, to warn other vessels of her presence. Neither Williams, nor Hancock, nor anybody connected with the petitioner, adequately appreciated the very great peril to other vessels which this wreck, lying

in the center of this narrow channel, created, nor the legal obligation on its owner to mark it, nor the practical necessity of immediately doing so in an adequate manner. No warning marker was put there until about 9:30, and then only because the police authorities ordered Williams to do so at once, instead of waiting, as he evidently intended to do, until the arrival of the derrick and salvaging vessels.

In the meantime the Massachusetts, a large steamer inward bound, struck the wreck and received very severe injuries. The damage claimant's statement of damage and demurrage amounts nearly to $50,000.

The Dredge Company have petitioned for limitation of liability upon offering to surrender the drill boat in its sunken condition. To this petition the damage claimant, having presented its claim, answers that the petitioner is not entitled to limitation of liability, because (among other reasons) the faults which occasioned the injury were attributable to the owner personally, and were not, therefore, without its privity or knowledge. On this point certain other facts should be stated. The petitioner is a New Jersey corporation having its home office at Chicago, Ill., where its officers were located. Its work and its plant in Boston Harbor were wholly in charge of Williams, a superintendent appointed by the vice president and general manager. No corporate officer had anything to do with the details of the actual work in Boston, except to receive and act upon reports or communications from Williams. There was on each drill boat a foreman, who had charge of the work and crew of that vessel. As above stated, the foreman of No. 4 was one Hancock. Under him was a night foreman, Maguire, who selected Folz and Murphy as the night watch for the time in question. Williams was not aware what men Maguire had assigned to that duty. Williams, Hancock, and Maguire were all thoroughly competent men for the operation of drill boats. None of them appears to have been a competent seaman, or to have had any general knowledge of vessels, or the proper management of them; nor does it appear that there were such men among those from whom Maguire selected Folz and Murphy. Apparently the two named were as competent in those respects as anybody available. Hancock testified that he thought he would have picked them out himself. Williams had received no instructions from his superiors about marking wrecks or sunken obstructions caused by the petitioner's work; and he had never given any such instructions to the men under him. He knew in a general way that there was a duty to do so.

The right to limit liability exists only in cases where the fault was "without the privity or knowledge of the owner," and the petitioner contends that the faults alleged here were of that character. The damage claimant, on the other hand, charges two personal faults against the owner of the drill boat: First. That it was unseaworthy, because insufficiently manned, and that the upset and the collision are both attributable to this fault. Second. That the wreck was not marked immediately, as required by the Act of March 3, 1899 (30 Stats. 1152); this duty to mark being, it is contended, one resting upon the owner personally, which cannot be delegated.

Was the drill boat properly manned? Folz was a competent ma-

233 F.—38

chinist and drill operator. He was no seaman; he had no general knowledge of or acquaintance with boats, and no experience which fitted him to deal with a marine emergency. And so with Murphy. He had been to sea, it is true, but in the fireroom, not on deck, and he was wholly unequipped to assist effectively in the situation which developed. The drill boat was in fact treated by the petitioner and its representatives, not as a vessel, but as a piece of machinery, and was manned accordingly. It was, however, stationed in the center of the channel into a frequented port. It was not probable that accidents would happen to it, but it was always possible that they might. Vessels stationed in harbors are subject to certain recognized hazards out of which emergencies may arise. In this case there was the additional risk caused by the possibility that the spuds might stick. If, from collision or upset, or any other cause, the drill boat did sink on its station, it would immediately become a great source of danger to other vessels. It was the duty of the petitioner to keep it properly manned for the work and situation in which it was stationed, by men fitted to exercise, under any conditions which might reasonably be foreseen, prudent and careful seamanship. Neither of the men on the drill boat had such ability, and the petitioner had no reason to suppose that they did. The Cygnet, 126 Fed. 742, 61 C. C. A. 348 (C. C. A. 1st Cir.). The drill boat was insufficiently manned, and was therefore unseaworthy; and this fault is attributable to the petitioner personally. In re Pacific Mail S. S. Co., 130 Fed. 76, 82, 64 C. C. A. 410, 69 L. R. A. 71 (C. C. A. 9th Cir.).

The next question is whether the crew of the drill-boat acted negligently. For handling the spuds, engines, and other machinery they were competent men. I am not quite prepared to say that they were negligent in not sooner discovering that the spuds were jammed, or in the efforts made to free them. So far as the sinking itself is concerned, I do not think that the petitioner can be held at fault for it.

The failure properly to man the drill boat did not enter into the accident, unless there was a further duty on Folz and Murphy, as its crew, to take steps after the sinking to warn other vessels of the wreck. If there was such a duty, Folz and Murphy were clearly negligent in not fulfilling it; and this was because the men, as above stated, had no previous training or experience which at all fitted them to cope with such a situation. This fault would be directly attributable to the improper manning. Folz and Murphy were hired as a night watch for the drill boat. They did not live aboard it, but went back and forth to it from the shore. Their employment did not terminate when their vessel sank. "The duty of the seamen continues on these melancholy occurrences as long as they can be useful in preserving the property at risk and gathering up its fragments." Story, J., The Two Catherines, Fed. Cas. No. 14,288. See, too, The Massasoit, 1 Sprague, 97, Fed. Cas. No. 9,260; The Dawn, Fed. Cas. No. 3,666 (2 Ware, 126); The D. M. Hall and The John Land, Fed. Cas. No. 3,939; Daniels v. Atlantic Mutual Ins. Co., 24 N. Y. 447.

If this be the duty of ordinary seamen, whose wages under such circumstances depend upon property being saved, it was clearly the

duty of Folz and Murphy, whose wages were not so conditioned. The danger of further injury to the drill boat from collision with other vessels was great; it was in fact seriously damaged by the Massachusetts. It was clearly the duty of its crew to use reasonable care and diligence to protect it against such damage, and in connection therewith to warn other vessels against colliding with it. This they failed to do, and there were not overweighing considerations—e. g., of personal safety— which justified them in disregarding those duties. I therefore hold that the petitioner was personally at fault for the unseaworthy condition of drill boat No. 4, due to its being improperly manned, and that to this fault is attributable the failure of the crew to warn the Massachusetts, by marker or otherwise, of the existence of the wreck.

[3] The statute explicitly requires "the owner of such sunken craft to immediately mark it." 30 Stats. 1152. This was a personal duty, which could not be delegated, so as to relieve the owner from responsibility. The Anna M. Fahy, 153 Fed. 866, 83 C. C. A. 48 (C. C. A. 2d Cir.); The Macy, 170 Fed. 930, 96 C. C. A. 146 (C. C. A. 2d Cir.); Weisshaar v. Kimball S. S. Co., 128 Fed. 397, 402, 63 C. C. A. 139, 65 L. R. A. 84; In re J. Smith & Sons, Inc., 193 Fed. 395, 113 C. C. A. 391 (C. C. A. 2d Cir.). In the present case it was easy to have complied with it. Folz and Murphy could have slacked the line to the scows and have held them fast to the dredge; or they could have taken the oars and gone ashore in the rowboat for help; or they could have asked the tug to moor them to the projecting parts of the wreck, when she towed them past it about 5:30 a. m.; or they could have taken a boat and gone down from drill boat No. 8; or have asked the police boat when it called at drill boat No. 8, about 6 a. m., to mark the wreck. They made no effort to do any of these things. Hancock might easily have placed a marker at 6:30, when he came out in the launch with the day crew; and I think, although this perhaps is not so clear, that Williams was informed that the drill boat had sunk, early enough so that, if he had sharply set about marking the wreck, he could have done so before the collision. These witnesses testify that they did not place a marker because enough of the wreck was showing to warn other vessels of the danger, and to make marking unnecessary. Up to a certain time parts of the drill boat projected above the surface; that they were ever sufficient to furnish adequate warning of a submerged wreck to approaching vessels not expecting such a thing is doubtful. As the tide rose they became less conspicuous. The witness who last saw them before the collision, Capt. Sparks of the General Jessup, testifies that there were two or three slanting pieces, not of large size, the highest then about 3 feet out of water. Nobody testifies to having seen them after that time. Hancock says that, viewing them some time before the accident, he thought they were so high out of the water that the tide would not cover them before the petitioner's employés would get there to begin salvage operations. But Provonsha testifies that Hancock said that they must hurry to get back to the wreck before it was covered by the tide.

Capt. Daley, of the United States steamer Colonel Harwood, testifies that it was a very fine summer morning; that he was coming up the

Harbor, and had looked directly across the water where the accident took place from a distance of about 100 fathoms, just before the Massachusetts, which was overtaking and passing him, struck; and that there was nothing to indicate any obstruction or danger there. His testimony is apparently disinterested, and on this point fully corroborates that of the officers of the Massachusetts. Her captain and first officer were on watch in her pilot house; there was a lookout on her forward deck, and a quartermaster at the wheel. All were alert and attending to their duties. It seems wholly unlikely that they, as well as Capt. Daley, failed to see parts of the wreck sufficiently prominent to constitute adequate marking of it. Certainly such failure ought not to be found, except upon clear and convincing evidence that such projecting parts were then apparent; and there is no such evidence. Whether the projections of the wreck above the surface, noticed earlier in the morning, were lower than they had been judged to be by the men who saw them, and were covered by the rising tide, or whether the wreck had settled into a lower position before the collision, it is unnecessary to determine. The projections had neither such size nor such assurance of permanence as justified the petitioner and its employés in relying on them to make the wreck evident to other vessels, and excused the failure to mark it. There is no reasonable doubt that, when the Massachusetts came along, it was unapparent and unmarked. The Massachusetts was not at fault for failing to discover and avoid it, nor for passing over where the drill boat had been at work without first ascertaining that there was no obstruction there. If the petitioner's work caused an obstruction in the channel, it was the petitioner's duty to mark it, or to see that it was marked. Casement v. Brown, 148 U. S. 615, 623, 13 Sup. Ct. 672, 37 L. Ed. 582; Consolidated Co. v. Knickerbocker, etc., Co., 200 Fed. 840 (D. C. Me.).

The negligent and unexcused failure to mark the wreck, whether due to incompetence of the crew, or to disregard of the statutory duty, is attributable to the petitioner personally. It was the proximate cause of the collision. It follows that the petition to limit liability must be denied.

Many other points were argued, but those decided are sufficient to dispose of the case.

There must be a decree denying the petition to limit liability, establishing the claim of the Eastern Steamship Corporation for full damages, holding the Great Lakes Dredge & Dock Company personally and solely at fault for the damage which the Massachusetts sustained, and referring the case to an assessor to ascertain the amount of such damage.