PETITION OF UNITED STATES.
THE F. S. 231.

UNITED STATES v. BLACK DIAMOND S. S. CORPORATION.

THE MIDLAND VICTORY.

HARTZELL v. UNITED STATES.

Nos. 26, 67, 68, Docket 21379, 21433, 21434.
United States Court of Appeals,
Second Circuit.

Argued Oct. 11, 1949.

Decided Nov. 21, 1949.

H. G. Morison, Assistant Attorney General, John F. X. McGohey, United States Attorney, New York City, Alfred T. Cluff, Special Assistant to the Attorney General, Proctors for United States of America.

Hunt, Hill & Betts, New York City, Proctors for the Claimant and Cross-Respondent-Appellant, Black Diamond Steamship Corp., John W. Crandall, Robert M. Donohue, New York City, Of Counsel.

Simone N. Gazan, New York City, Protor for Claimants-Appellants.

Before AUGUSTUS N. HAND, CHASE and FRANK, Circuit Judges.

CHASE, Circuit Judge.

This case involves three distinct questions which will be separately considered in this opinion. The background for all three may, however, be stated as follows.

The Midland Victory, an American steamer owned by the United States but operated under a bareboat charter by the Black Diamond Steamship Corporation (hereinafter called "Black Diamond"), and the F. S. 231, a United States Army transport, collided about half an hour before midnight on August 24, 1946, in the ocean off Fire Island, New York. Both vessels were damaged and four members of the crew of the transport were lost and several sustained personal injuries. Black Diamond filed a libel under the Public Vessels Act, 46 U.S.C.A. § 781 et seq., in the United States District Court for the Eastern District of New York, against the United States, for damages to the Midland Victory. The United States then filed a petition in that court for limitation of, and exoneration from, liability, and subsequently a cross libel for damages to it resulting from the collision. Suits for the deaths of three, and for the personal injuries of five, of the transport's crew were brought against Black Diamond, some of these suits being brought in the Southern District of New York and some in the Eastern District, some at common law, and the others in admiralty. The trial court restrained the trial of these suits against Black Diamond, and the personal injury and death claimants have appealed. Both vessels were held at fault, and both Black Diamond and the United States have appealed from the interlocutory decree so holding, contending that the other's vessel was solely at fault. The petition of the United States was denied, and it has appealed.

Liability for the Collision.

Black Diamond's Midland Victory, a vessel of 7,606 gross and 4,549 net tons, with an overall length of about 455 feet and a beam of 62 feet, was bound on the night of the collision, for New York on a voyage from Rotterdam with 1390 tons of cargo aboard and was off the coast of Long Island, headed for the Ambrose Light vessel. She was equipped with cross compound geared turbine engines that gave her a cruising speed of about $18\frac{1}{2}$ knots, and was manned by experienced officers and an experienced crew. The F. S. 231, a transport of 573 gross and 270 net tons, with a length of 180 feet and a beam of 32 feet was bound for St. Johns, Newfoundland, from New York. She was manned by unlicensed officers and an inexperienced crew, and was equipped with a twin-screw motor that gave her a cruising speed of about $9\frac{1}{2}$ knots. The weather was clear and there was good starlight visibility, with only a slight sea and a negligible wind.

The trial court found that at all times before the accident both vessels were travelling at their full cruising speeds, that each was displaying proper navigation lights, and that each had seen the other's lights for half an hour or more before the collision, though only the white masthead light of the transport was noticed by the

navigators of the Midland Victory and they erroneously thought it was the stern light of a vessel they were overtaking. It was found that, as the vessels approached each other, the Midland Victory took the first action, when they were a quarter to a half mile apart, with a right and then a hard-right rudder, accompanied by a one-blast signal. The F. S. 231 was found to have heard this signal and then to have changed her course with a hard-left rudder accompanied by a two-blast signal. Thereafter the Midland Victory blew a one-blast signal which was again answered by the F. S. 231 with two blasts.[1] The vessels collided a few miles southeast of Fire Island Lightship buoy, which is located nine miles south of the shore light on Fire Island, New York. The collision was at right angles, the bow of the longer vessel striking the starboard quarter of the transport close to the latter's stern. The Midland Victory was held at fault for not maintaining a proper lookout, mistaking the F. S. 231's white light for that of a vessel being overtaken and failing to see the F. S. 231's side lights, which it was found, should have been seen at a distance of two miles, combined with her failure to reduce speed or reverse engines when she was in doubt as to the course and intentions of the F. S. 231. The latter was also held at fault for negligently steering hard left and attempting to cross the larger vessel's bow and in negligently failing to stop or reverse her engines after hearing the signals of the Midland Victory.

█ The trial court refused, however, to make any findings as to the bearings of the vessels when they first sighted each other, their courses, or the changes in those courses, on the ground that there was ample time and space afforded to each to prevent the collision, regardless of these bearings and courses. Both parties claim that findings should have been made, the United States insisting that there was a starboard to starboard approach, and Black Diamond contending that fifteen minutes before the collision a meeting situation arose, that continued as such or developed into a crossing situation. Our study of the record discloses nothing which makes necessary to decision specific findings as to the courses of these vessels at any time previous to the point when they were within about eight miles and about fifteen minutes of collision. They were navigating in open water with no other vessels in a position to hamper them in making any maneuvers they might have chosen to make and it is plain that eight miles and fifteen minutes gave to each ample space and time to avoid collision. What occurred before, we think, was too remote to be treated as a cause of collision.

█ The findings, made upon substantial supporting evidence, show that both vessels were displaying all the required navigation lights and that under the prevailing weather conditions the red and green lights of each were visible for at least two miles. It is undisputed that until collision was imminent the F. S. 231 had for at least ten minutes held a course of 79° true and that the course of the Midland Victory during that time had been changed from 267° true to 270° true about fifteen minutes before the collision and then to 272° true about four minutes later. No signal was given upon either change of course and, while, strictly speaking, one blast should have been given each time, we consider the omission of no real consequence; the vessels were still so far apart that it cannot be said to have been a proximate cause of the collision. But, as what later happened clearly shows, the vessels were, at least five minutes before the collision, so heading, relatively to each other, that one or both of the colored lights of the F. S. 231 could have been seen by those in charge of the Midland Victory. The undisputed evidence shows that a lookout was stationed on the bow of the Midland Victory in a position where his view of the F. S. 231 was unobstructed and that that the third officer was on the upper

---

1. The evidence seems to indicate, however, that the Midland Victory's first one-blast signal was for her right rudder, but was given after the vessel began to swing right, and her second for her hard-right rudder.

bridge in charge of its navigation with his view of the transport also unobstructed. It shows further that he had binoculars through which he looked at the F. S. 231 every two or three minutes and that, in addition, the captain went to the bridge just before the change of course to 272° true, which he ordered made, and that his view of the F. S. 231 was also unobstructed. The lookout testified that he saw only one white light on the F. S. 231 until the vessels were about three hundred yards apart,[2] when he saw the red and green lights. The third officer, the captain, and the seaman at the wheel all testified that they saw only one white light on the F. S. 231 before the collision. The first two thought until just before collision that the white light they saw was the stern light of a vessel they were overtaking. Under the circumstances this evidence is simply incredible, for within a short time, about two to five minutes, before collision the Midland Victory put her wheel right and sounded one blast, and the F. S. 231 then put her wheel left and sounded two. This was followed at once by the Midland Victory's going hard right on another one blast signal and by the F. S. 231 keeping on to her left with a two blast signal, all of which brought the vessels into collision as previously stated.

■ Thus, in order to get to the point of collision in the way these vessels did, they obviously had to be showing each other their colored lights when they were at least two miles apart. Yet no one, except perhaps the lookout, on the Midland Victory saw the colored lights on the F. S. 231 until the vessels were in dangerously close quarters, and it is impossible to tell when he saw them. Those in control+ of her navigation were charged with the knowledge which they would have gained from seeing what was in sight, The New York, 175 U.S. 187, 204, 20 S.Ct. 67, 44 L.Ed. 126, and consequently that they were not overtaking the vessel ahead. Needless to say, it is no excuse to say that their navigation was proper in an overtaking situation.

■ We agree with the trial court that, regardless of the vessels' approach, the Midland Victory was at fault. If the approach was starboard to starboard, she was of course at fault, among other things, for turning into the course of the F. S. 231, which, it seems obvious, she never would have done had she not wrongly assumed that she was overtaking the transport. If in the approach the Midland Victory was on the transport's starboard hand, and showing her red light, though the privileged vessel under Article 19,[2a] she was bound to keep her course and speed under Article 21;[3] instead she made right turns, not once, but four times in the last fifteen minutes, directly into the course of the transport, the last two of which, at least, she undoubtedly would not have made had her navigators seen the lights that were there for them to see. The only situation in which her maneuvering would have been at all justifiable was a meeting end on, or nearly end on. In that situation, under Article 18,[4] she would have been bound to go right, which is what she did. But her navigators, with the knowledge of the actual situation which attentive observation would have given them, might have passed the F. S. 231 safely port to port. In any event, they should certainly have gone to the right soon enough and far enough to have avoided close shaving. The water was there, the time was there, and, if the approach was head and head, the opportunity to pass safely to port was missed quite plainly in part because of the erroneous belief held by the navigators of the Midland Victory right up to the last fatal seconds that it was an overtaking situation. If finally, as we think most likely, some fifteen minutes before the collision the ves-

2. This witness's conception of time or distance or both was inaccurate, for he estimated that when he saw the red and green lights of the F.S. 231, it was about five minutes before the collision. Five minutes from the collision the vessels were about 2⅔ miles, not 300 yards apart.

2a. 33 U.S.C.A. § 104.

3. 33 U.S.C.A. § 106.

4. 33 U.S.C.A. § 103.

sels were meeting nearly head to head, and at some time subsequently a crossing situation developed, so that, even if the colored lights of the transport had been seen by the Midland Victory's navigators they would have been in doubt as to which kind of a situation existed, they should have stopped or reversed their vessel, or at least had her hang back. Instead they let her plunge ahead at full speed, and in doing so she would have been plainly at fault. The New York, 175 U.S. 187, 201, 20 S.Ct. 67, 44 L.Ed. 126.

Moreover, the bearing of the F. S. 231's white light, which was for a long time seen from the Midland Victory, did not change appreciably, Black Diamond's own witnesses state, until the vessels made their last changes of course. This was in itself a danger signal and should have put the Midland Victory on guard against possible risk of collision. 33 U.S.C.A. § 101. It must be granted that if only one white light had actually been visible it should, at least provisionally, have been taken to be a stern light. Ocean S. S. Co. of Savannah v. United States, 2 Cir., 38 F.2d 782, 784. It is true also that it is difficult to gauge by one light whether a vessel ahead is approaching or being overtaken. But, in view of the more or less constant bearing and in view of the rapidity with which the transport's light was nearing, at some time prior to the collision, doubt should have arisen as to whether the transport was really being overtaken. And in case of doubt, a vessel is bound to stop until the other vessel's position or course is ascertained. Nevertheless, the Midland Victory kept on at full speed, unheedingly, into such close quarters that she quite unnecessarily brought herself into a position of great danger. Such faults, directly contributing to cause the collision regardless of the kind of approach, are too well established to yield to the contention that the F.

S. 231 was so much more at fault that she should be held solely liable.

In order to determine whether the F. S. 231 was at fault, however, it is essential that we review the evidence at least as to whether the vessels were approaching starboard to starboard, since the trial court made no specific findings on this point.[5] It seems clear that if they were the F. S. 231 must be absolved. The S. S. Bylayl, D.C.S.D.N.Y., 49 F.Supp. 439, affirmed Per Curiam, Pocahontas S. S. Co. v. The Vacuum, 2 Cir., 139 F.2d 348. Compare Puratich v. United States, 9 Cir., 126 F.2d 914; The Bellhaven, 2 Cir., 72 F.2d 206. If, however, the Midland Victory were showing her red light to the transport and were on the transport's starboard hand, the latter, as the burdened vessel, would have been bound to keep out of the larger vessel's way. Article 19.[6] It is the risk of collision that must be avoided, Ocean S. S. Co. of Savannah v. United States, 2 Cir., 38 F.2d 782, and if the F. S. 231 became the burdened vessel she was required by Article 23[7] to slacken her speed or stop or reverse if necessary to keep out of the way and by Article 22[8] to avoid crossing ahead of the Midland Victory. It would seem that the prudent thing for her to have done, if the vessels were crossing, would have been to have gone to the right, perhaps reversing her inner screw, and to have turned before she did. See Knight, Modern Seamanship (9th ed.) pp. 471 et seq. Instead, at the last moment she turned left, trying, if this was a crossing situation, to cut across the Midland Victory's bow. True, in doing so, she needed to continue at full speed, and, indeed, her maneuver was almost successful. This, however, would not absolve her of fault. If finally the approach was end to end, or nearly so, then, as Article 18 provides,[9] she should have turned right at some time prior to the collision. Consequently, if the

5. We do this in amplification, and not modification, of the trial court's findings and adhere to the well established rule that they will be upheld unless clearly erroneous. E.g. The Paul Dana v. Socony Vacuum Oil Co., 2 Cir., 165 F.2d 78, 79.

6. 33 U.S.C.A. § 104.

7. 33 U.S.C.A. § 108.

8. 33 U.S.C.A. § 107.

9. 33 U.S.C.A. § 103.

situation were a meeting one, the transport was plainly at fault.

The evidence, as in most collision cases, is conflicting. The Midland Victory's third officer testified that the transport was off his vessel's port bow, from twenty minutes before the collision, up to just before her right turn, which, he said, was occasioned by the white light of the transport closing on the Midland Victory's bow; that he changed course at 11:15 Midland Victory time from 267° true, at which time the bearing of the transport's light opened slightly; and that the captain at 11:24 ordered another change of course to 272° true, at which time that bearing also opened slightly, so that it was perhaps a point to a point and a half off the port bow. The Midland Victory's captain testi-fied that when he came on the bridge the transport's white light did not appear to be broadening after the change of course from 270° to 272°; he "assumed then that he was crowding to the north and on to my course"; consequently he ordered the wheel right; and, after his vessel was un-der right rudder, he saw the transport's white light suddenly swing to starboard, "apparently to me, and to cross my course," at which time he ordered the wheel hard right. The seaman who was at the wheel of the Midland Victory from ten to twelve P.M. testified that he saw the white light of the transport five to ten degrees off his vessel's port bow some thirty to forty min-utes or, he said, five to eight miles away; that he changed her course from 267° to 270° true about ten minutes before the col-lision, pursuant to the third mate's com-mand, and from 270° to 272° true about five or six minutes later; and that the course of the transport was not steady, in that her light was frequently blotted out by the Midland Victory's mast and then moved again to the port bow a few degrees.[10] The Midland Victory's lookout testified that he first saw the white light of the transport about one point port about a thousand yards away, some fifteen minutes before the collision; that at eight hundred yards this light came to be dead ahead; that he then saw the red and green lights of the transport dead ahead at about 300 yards or, he said, some eight minutes be-fore the collision; that the red light closed out "pretty close" to five minutes before the collision; that he could see the green light right up to the time of the collision; and that, about a hundred yards away, the transport's bow crossed to starboard.

The captain of the transport testified that he first sighted the Midland Victory's white lights at about 10:55 F. S. 231 time (which was ten minutes faster than Mid-land Victory time), when the vessels were at least twenty miles apart; that he then immediately changed his course from 95° to 86° true, and, as soon as the transport was steady on that course, he saw both side lights of the Midland Victory about a point and a half on the starboard bow;[11] that he then immediately, that is, three or four minutes after the transport was on the course of 86° true, or at about 11:00 F. S. 231 time, when the vessels were still some twenty miles apart, altered the trans-port's course again, to 79° true; that the bearing of the Midland Victory broadened on the starboard bow from then on until ten minutes before the collision, when she was three and a half or four points off, at which time he could see only her green side light. However, it is seriously to be doubted whether even on such a night as this, he could have seen at least the colored lights at the distances he claims he first did see them, and this subjects to doubt his testimony as to time. His lookout testi-

10. At a Coast Guard investigation, taking place prior to the trial, he had testified that the bearing of the white light of the transport was "maybe a degree or two away from the port bow because I looked straight ahead and I looked on the port side of the main mast on our ship and I just could see the light and sometime the light is moving up and down and sometime right behind the mast and you couldn't see it at all." He had also testified that the light "stayed almost exactly the way it was from the very be-ginning I saw it until the collision."

11. At the Coast Guard investigation, he had testified that when he saw the side lights of the Midland Victory she was dead ahead.

fied that he first sighted the white light of the Midland Victory at 11:15 or 11:20 F. S. 231 time, and that the light was dead ahead; that it gradually broadened on the starboard side; that five or ten minutes after he first observed the Midland Victory, he saw her green light, about a point and a half off the starboard bow of the F. S. 231; that thereafter the other vessel "was coming down the starboard side coming past us—it looked like it was going to pass us on the starboard side"; and that he never saw the Midland Victory's range light.[12] The third officer of the transport first testified that he took the wheel at about 11:10 or 11:15 F. S. 231 time, at which time the course was changed to 79° true, and that the course he steered would vary two to three degrees. He later testified, however, as he had at the Coast Guard investigation, that he did not change the course to 79° true until ten or fifteen minutes after he took the wheel, in other words at about 11:25 or 11:30 F. S. 231 time.

The United States claims that, as a matter of mathematics, the collision could not have occurred unless there was a starboard to starboard approach. Because the Midland Victory went faster and turned faster than the transport, and her bow transferred faster than did the transport's, the argument runs, the Midland Victory had to be to the south and, indeed, the approach had to be green to green, for her to hit the transport aft. This assumes at the least, however, that the transport did not begin to cross the Midland Victory's bow before the latter's right rudder began to take hold, an assumption which Black Diamond disputes. It will be remembered that the Midland Victory's captain and third officer were consistent in this, that the transport's white light, which had been about a point and half port, began to close on the Midland Victory's bow and was crossing it either just before or just after the captain had given the order to turn right. And the Midland Victory's look-out testified that ultimately the transport's bow crossed to starboard though we cannot put much faith in his estimate that it was when the vessels were 100 yards apart.

We are thus confronted with two conflicting versions of the approach, the transport's being that it was starboard to starboard and that the transport was not, in the final minutes, crossing the Midland Victory's bow; and the Midland Victory's being that the approach was nearly end to end and that the transport was crossing her bow. The trial court made no findings as to whose version is right, though it did find that the Midland Victory took the first action, thus ruling out any sudden swing to the left by the transport, prior to the right turn of the Midland Victory. However, the trial court also found the F. S. 231 at fault for attempting to cross the Midland Victory's bow.

The testimony of the individual witnesses is, as above outlined, almost wholly irreconcilable. We need not, however, remand the case for the necessary findings, since the testimony of every one of the witnesses above mentioned except that of the lookout and third officer of the transport was taken on deposition. Confronted with a difficult choice, we are inclined to accept the version of the Midland Victory.

We believe that the vessels were meeting nearly end to end with the transport from a few degrees to a point or a point and a half off the Midland Victory's bow, about fifteen minutes before the collision. The third officer of the transport recalled that it was at about that time that he received the order to change course to 79° true. The captain of the transport testified that he had ordered that change of course immediately upon seeing the Midland Victory's side lights. It seems more likely that he did see them, and thus give the order, when the vessels were about fifteen minutes and eight miles apart than when they were forty minutes and twenty miles

12. He, too, testifying at the Coast Guard investigation, had said that he saw the red and green lights of the Midland Victory three or four minutes after he first saw her white light, and that they were dead ahead or not more than five degrees off the starboard bow.

apart, for there is substantial evidence in the record that colored side lights could not be seen, even on a clear, starlit night like that of the collision, at the longer distance. It is, then, around that time, we believe, that the F. S. 231 changed its course from 86° to 79° true. And it was at about that time that the Midland Victory changed its course from 270° to 272° true. With these turns, the white light of the transport began, perhaps imperceptibly at first, to close on the bow of the Midland Victory. About five minutes later, when the captain of the Midland Victory came up to the bridge, he thought the situation too close for comfort and ordered the course right two degrees, which brought the Midland Victory on to her course of 272 degrees. This slightly opened the transport's white light on the Midland Victory's port bow, but, as the vessels were approaching, the change in position of the transport became more and more marked to the left, or, viewed from the Midland Victory, the transport seemed to be crowding more and more on to her course. Perhaps the transport did occasionally catch a glimpse of the larger vessel's green side light, but this might be explained by the ordinary inevitable yawing of a degree or two, by either vessel or both. In any event, we think the Midland Victory's red side light was equally and, indeed, more frequently visible to the transport. Finally, the courses converged, and the white light of the transport began to cross the Midland Victory's bow. The same inattentiveness on the part of the latter's navigators that caused them to fail to see the transport's side lights would explain, perhaps, why they thought that the swing of the transport's light across the Midland Victory's bow was a sudden, rather than a gradual, occurrence. Just before, and in view of the then more perceptible closing of the white light of the transport on the Midland Victory's bow, the captain of the latter ordered a right turn. He admittedly

delayed sounding his whistle (another fault, perhaps, to be laid at the door of the Midland Victory)[13] but when he saw that they "were not getting away and the other vessel crowding," he sounded one blast, and then ordered the wheel hard right. The transport should at some time beforehand have turned right whether the situation was still a meeting nearly end on or had developed into a crossing. Instead, it had maintained its course and speed, and ultimately turned left, and the vessels collided.[14]

■ This seems to be another instance where there was ample space, time and opportunity by taking the precautions which the circumstances well indicated should have been taken, for each vessel to have avoided the collision. Instead, both navigated at their top speeds towards each other and each maintained that speed right up to the moment of impact in complete disregard of what the other was doing. We may look upon what was done after the Midland Victory's right, and before her hard right, turn with a lenient eye, since the vessels may perhaps have then been navigating in the jaws of collision. But the prior navigation of the transport, and the inattentiveness of, and consequently, the navigation by, those in command of the Midland Victory, are not to be condoned. We agree with the trial judge that both were at fault.

### Petition for Limitation.

The trial judge found on adequate evidence that the captain of the F. S. 231 did not have a master's license; the second officer had no license; the third officer who was on watch at the critical times had no license; the lookout was rated as a third class machinist's mate and had had no previous deck experience; and the only other member of the deck crew that night was an ordinary seaman "with little or no previous experience."

13. See The Corozal, D.C.S.D.N.Y., 62 F. Supp. 123, 126.

14. The testimony of the Midland Victory's lookout, confused as it is with respect to both time and distance, is almost in its entirety consistent with our version of how the collision occurred: as the transport neared the Midland Victory, the transport's red light must finally, have closed out.

He also found that,

"The crew of the Transport was supposedly obtained under regulations promulgated by the Chief of Transportation in Washington, D.C. In substance, it was the policy to recruit licensed or certificated marine personnel wherever possible, but if such personnel was not available, due consideration should be given to those who proved themselves qualified.

"This crew was selected by a so-called 'Crewing Section.' No instructions appear to have been given this agency as to how to determine whether the regulations were duly performed, nor does it appear that any such care was exercised by it.

"All the crew, from the Master down, composing the Transport deck force, at the time of the collision, were incompetent and inexperienced men. The Master of the Transport had no knowledge as to the qualifications of the other officers and men, the Marine Superintendent and Port Captain of the Transportation Corp. at the New York Port of Embarkation made no effort to ascertain from the Master of the Transport whether he had satisfied himself as to the qualifications of the crew. The navigation of the Transport was deliberately and knowingly entrusted, by those representing the Government in the operation of its vessels, to unlicensed and incompetent men, and the method of employing this crew of unlicensed and unqualified men, took place with the privity, and knowledge of those representing the United States, and could not be excused by the rate of pay or by war conditions, as it was being followed as late as 1948.

"The duty of selecting qualified and proper officers and crew members for the Transport was not properly performed by the petitioner. Knowledge that this crew was incompetent and unlicensed, and not qualified, was properly chargeable to the petitioner, and the petitioner, therefore, is not entitled to limitation of its liability."

Since the United States did not appeal but merely filed assignments of error, it has been rather hesitantly suggested that, because Black Diamond's appeal was limited to that part of the decree holding it jointly at fault for the collision, no issue as to limitation is here for review. However, Black Diamond's appeal gave this court jurisdiction to review the decree and Rule 13 of this court provides not only that the appellant may limit his appeal to one or more questions but also that, independently of any limitation by the appellant, if the appellee desires other or further relief than that granted by the decree, he may file and serve an assignment of errors. Thus the United States had the right to have the decree reviewed in respect to the denial of limitation.

The fault of the F. S. 231 is, of course, to be taken for granted on the question of limitation, as that is really a defense equivalent to one of confession and avoidance. The petitioner consequently has the burden of proving that the admitted wrong attributable to it was done without its privity or knowledge. Southern Pac. Co. v. United States, 2 Cir., 72 F. 2d 212, 215. It is the non-delegable duty of a private shipowner to man his ship with competent officers and crew. In re Pacific Mail S. S. Co., 9 Cir., 130 F. 76, 69 L.R.A. 71; The Drill Boat No. 4, D.C., Mass., 233 F. 589.

In so far as decision turns upon whether or not the F. S. 231 was properly manned it seems clear it was not and there is no occasion to elaborate on what the trial judge found in that regard.

While the United States may not be required to comply with the statutes covering private owners as to the employment of licensed personnel, it is bound to provide a fair equivalent. And yet the government issued no regulations pertinent to this subject except that: " * * * It is the policy of the Chief of Transportation to recruit licensed or certified marine personnel, whenever possible. If such personnel are not available, however, due consideration will be given to applicants who are otherwise qualified to fill the positions in question whether or not they are licensed or have seamen's papers." There was no standard of equivalency set up as a guide to recruiting officers and the sum and substance of it is that it was left to such

officers to recruit whatever men appeared to them to be qualified. Having put that arrangement into effect the government was rightly charged with knowledge that it was being carried out and we think it amply shown that the improperly manned vessel was allowed to sail with its privity and knowledge.

Restraining of Trial of Suits.

We need not determine whether the suits the personal injury claimants brought against Black Diamond should have been allowed to go to trial pending decision on the petition for limitation. It is sufficient to say that continuance of the stay is no longer justifiable and consequently it is dissolved.

Affirmed in part; modified in part.