## BLACK et al. v. UNITED STATES.
### No. 412.

District Court, D. Maine, S. D.
Oct. 23, 1934.

Ralph O. Brewster and Harry C. Wilbur, both of Portland, Me., and Burnham, Bingham, Pillsbury, Dane & Gould, of Boston, Mass. (Albert Gould, of Boston, Mass., of counsel), for libelants.

Frank Staley, Asst. Atty. Gen., and Frederick R. Dyer, U. S. Atty., and William B. Nulty, Asst. U. S. Atty., both of Portland, Me., for the United States.

PETERS, District Judge.

This is a libel in personam brought against the United States under authority of an Act of Congress approved February 14, 1933 (47 Stat. 1719), to recover for the loss of a vessel and cargo occasioned by collision with the United States submarine R–3 in Buzzard's Bay, on November 24, 1919.

I find the pertinent facts to be as follows: The schooner Oakwoods, about 96 feet long, having a tonnage of 137 gross and 130 net, with a cargo of coal owned by the Clark Coal Company, was proceeding from New York to Bar Harbor and approaching the western entrance of the Cape Cod Canal with the purpose of anchoring for the night on the anchorage ground to the southward and westward of the approach to the canal.

The submarine, a much larger vessel, had passed through the canal from the east and was preparing to anchor for the night, when

her stem struck the schooner on her starboard side, causing her to sink within two or three minutes. This occurred about 9:30 p. m. The night was clear but dark, with starlight and no moon. The wind was moderate and about north-northwest, with a smooth sea. The schooner was proceeding on the port tack and making about four knots through the water under mainsail, foresail, fore-staysail, jib, and main-topsail. She was a two-masted schooner with one topmast, under command of Captain Black, a seaman of some thirteen years' experience, having been master and mate of other vessels. He was a son of the owner, the libelant, Herbert L. Black, who is also a master of vessels. He had with him as crew one man whom he described as a first-class seaman, about forty years old, and trustworthy. This man did not testify. Diligent efforts to find him were unsuccessful.

The schooner had arrived off Cleveland's Ledge buoy after dark on the day in question, and after passing that buoy close to starboard proceeded on a steady course toward the anchorage ground. The sheets were trimmed about one point to the wind. Captain Black was at the wheel and the other man was stationed at the bow on lookout. Both men remained at these stations until the collision occurred. The schooner held her course and speed until the end.

A short time before the accident, estimated by Captain Black to be fifteen minutes, a white light on a vessel which later proved to be the R–3 was observed off the starboard bow of the schooner by both the captain and lookout. At this time the submarine was in the approach channel to the canal. Presently she showed her sidelights to the schooner —first the red light, and then both lights, and then the green light—showing a change of course to port by the submarine about at the entrance buoy. The submarine was then proceeding about six knots an hour. At that time the green light on the schooner was opposed to the green light on the submarine. If that situation had continued it is obvious that the vessels would have passed starboard to starboard.

The submarine, not seeing the schooner, changed her course enough to starboard to make her red light visible to those aboard the schooner, and very shortly thereafter struck the schooner. The men on board had just time to get into a boat before she sank.

■ A principal point of dispute concerns the lights on the schooner. That the schooner had sidelights burning is established as a fact by the testimony of Captain Black and also by the testimony of those aboard the submarine who saw the green light just before the ship was struck, and by the entry to that effect in the submarine's log. It is strongly urged in behalf of the submarine that the green light on the schooner, the only light visible to the submarine, if burning at all, was a very dim light, not a proper one and not the light required by law. They base this claim partly upon the fact that no light was seen by those on board the submarine until immediately before the collision. Of course this is only negative testimony. It is a significant fact, to be adverted to later, that there was no lookout stationed as such on the submarine.

It is also testified by some of those on the submarine that the green light appeared to them very dim. That was at the time and in the excitement of the impending crash, when it is to be doubted whether any accurate appraisal of the quality of the light was made.

On the other hand, the captain of the schooner testified that on the evening of the collision he personally cleaned, filled, and lighted the lamps and placed them in the proper places in the rigging. That they were of the regular size and of capacity such as could be seen two miles away was also positively testified by the captain.

The general situation at the time has a bearing upon the question of lights. There is at least a strong probability that a man of Captain Black's background, in a small schooner, with other vessels in the vicinity, knowing that a steamer was approaching and having no way of disclosing his identity or position save by lights, would use reasonable precaution to see that they were doing their work. His safety and the family fortune might depend on it. That he was vigilant in that respect is shown by the fact that he got three different reports from his lookout man that evening, all to the effect that the lights were burning brightly—twice after the steamer was sighted. I am impelled to the conclusion that the schooner carried efficient running lights as required by law.

■ The criticism is made that the schooner was under-manned at the time of the accident. It is apparently true that the master, hailing from the eastern coast of Maine, was rather economical in the number of his crew. As pointed out by the defendant, the Seamen's Act of March 4, 1915, § 2 (46 USCA § 673), provides that merchant vessels of more than 100 tons gross, except those nav-

igating rivers, harbors, bays, or sounds exclusively, while at sea shall have the crew divided into at least two watches, etc.

This crew could not be divided that way, but that had no effect upon the conditions preceding the accident. At that time there was a good lookout stationed at the proper place on the schooner, the bow, and he was active in the performance of his duties. The submarine was sighted and reported, and the lights on the schooner were observed and reported on frequently. Nothing more could have been done even if there had been more men on deck; and if there had been two more men in the crew they would have naturally been below, as a sufficient number of men were on deck to operate the vessel.

The version of the officers of the submarine does not much differ from that of the captain of the schooner. They said they were leaving the entrance channel, had dropped the pilot, and were proceeding at a speed of from five to seven knots with a view of finding an anchorage. At that time the Commander was on the bridge with the executive officer steering, the chief gunner's mate on the periscope shears, and an ensign and another officer near the bridge. Some of these men had no particular duties at the time; one thought he was smoking. They saw no lights and knew of no vessel in the immediate vicinity until by the flare of their masthead light they saw a schooner heading across the bow from port to starboard. Immediately an order was given to reverse and to hard left the rudder. There was no time to back and probably the course of the vessel was not changed but slightly. The schooner was struck on the starboard side abaft the mainmast. The two men on the schooner were picked up from a boat and appeared to be exhausted, allegedly from lack of sleep.

The only point of dispute as to the conditions on the submarine is the matter of the lookout.

The Commander of the submarine gave his testimony by deposition. At that time, in giving the persons on the deck of the submarine, the Commander spoke of the chief gunner's mate as being "at lookout on the periscope shears." On cross-examination he was asked about his testimony before the Court of Inquiry and stated that he had testified at that time as follows:

"Q. Was there a member of the crew stationed as lookout? A. No man was stationed as lookout. The ship was making preparations to come to anchor. The chief gunner's mate always acts in that capacity in congest-

ed waters. With the captain and navigating officer on the bridge, there is no room for a lookout except on the periscope shears, where the chief gunner's mate was stationed."

The bridge is about 78 feet from the stem of the ship. There was no lookout whatever forward of a place in the vicinity of the bridge. The chief gunner's mate, referred to as being a lookout, testified. He said he was off watch at the time, had no special duties to perform, and was intending to stand by to let the anchor go. He said if he had seen a light he would have reported it; that there was no special lookout station; that "when I came on the bridge like that, I always acted as lookout and reported everything I saw"; and that on this occasion as he came up through the conning tower and stood on the starboard side of the bridge he just took a casual glance around. After he saw the sails of the schooner he saw what he refers to as a small, dim, green light.

It is a perversion of the term to call this man a "lookout." He happened to come on deck and happened to take a glance around. He was not charged with the duty and responsibility of a lookout.

The opportunity for a lookout on the bow is inconvenient. The space is only about 18 inches wide 5 feet back from the bow. Apparently submarines do not customarily have a lookout on the bow. There is some testimony that on submarines persons were not usually permitted forward of the bridge while under way at night for the reason that the sidelights of the submarine were so located that a man standing in the bow might obscure them from other people.

I find that at and before the time of the collision there was no lookout on the bow of the submarine and no lookout stationed as such anywhere else on the ship.

Certain conclusions of law easily follow from the facts as above set forth.

The schooner, being a privileged vessel, was required to hold her course and speed, and was within her rights in doing so, at least until a collision was plainly imminent, and no fault can be attributed to the schooner in this respect. Indeed, none is charged.

In view of the findings that she carried efficient lights and was properly manned and handled, no fault in any respect can be charged against the schooner.

The suggestion that the schooner should have shown a flare-up light is without merit. She was not being overtaken by another vessel, and her captain had no reason to

think that his lights had not been seen by the submarine until too late to do anything.

If either vessel is to be blamed for the collision, it must be the submarine. Under the rules for navigation applicable to this case her duty was to keep out of the way of the other vessel.

A steamer is prima facie liable for a collision with a sailing vessel and can only relieve herself by showing that the accident was inevitable or caused by the culpable neglect of the other. The Carroll, 8 Wall. 302, 19 L. Ed. 392.

The presumption being that the submarine here was at fault, she being required to keep out of the way of the sailing vessel, and as the sailing vessel here is exonerated, the only inquiry remaining is as to whether there was any fault on the part of the submarine probably contributing to the collision. It is clear that the absence of the required lookout is such a fault, as his only function is to prevent such an occurrence. A vessel having no lookout is in no position to claim that the accident was inevitable.

"It is the duty of every steamer navigating the thoroughfares of commerce to have a trustworthy lookout, besides the helmsman, and, in case of collision, the absence of such lookout is prima facie evidence that the collision was caused by the fault of the steamer. The Genesee Chief v. Fitzhugh, 12 How. 443, 13 L. Ed. 1058. When acting as the officer of the deck, and having charge of the navigation, the master of a steamer is not a proper lookout. The Ottawa, 3 Wall. 269, 18 L. Ed. 165. Proper lookouts are persons other than officers of the deck or the helmsman, and they should be stationed on the forward part of the vessel." The Pilot Boy (C. C. A.) 115 F. 873, 875, cited by Judge Hale in New England Maritime Co. v. U. S. (D. C.) 55 F.(2d) 674; The Arthur M. Palmer (D. C.) 115 F. 417.

It has been held many times in this circuit that the presence of a competent lookout in the bow is essential to the proper and careful navigation of a vessel.

"It is a primary rule of navigation that all moving vessels shall maintain a careful and efficient lookout. The lookout is 'both eyes and ears of the ship'; he must be properly stationed on the forward part of the vessel and must be held to a high degree of vigilance in that position. Neither the captain nor the helmsman in the pilot-house can be considered to be 'lookouts' within the meaning of the maritime law." Dahlmer v. Bay State Dredging Co. & Contracting Co. (C. C. A.) 26 F.(2d) 603. See other cases cited by Judge Hale in his opinion for the Circuit Court in this Circuit.

Counsel for the government does not take issue with the general rule, but says very frankly: "We recognize the severity of the rule requiring the position of the lookout to be in the bow. The peculiar deck construction of the submarine and the practical situation which the facts themselves present ought not to require the application of that rigid rule."

The court has no option but to apply the rule, and can make no exception in the case of submarines or other naval vessels where the law makes none.

This point was decided in Ocean S. S. Co. v. U. S. (C. C. A.) 38 F.(2d) 782, on page 786, where Judge Hand says: "It is thus apparent that the rules regulating lights were meant to apply to ships of war; article 13 [33 USCA § 83] would be conclusive if the preamble alone were not enough. If unfortunately it is impossible to equip submarines properly, they must take their chances until some provision has been made for them by law. We have no power to dispense with the statute, nor indeed has the Navy. As they now sail they are unfortunately a menace to other shipping and to their own crews, as this unhappy collision so tragically illustrates. We cannot say that they are not to be judged by the same standard as private persons. The safety of navigation depends upon uniformity; only so can reliance be placed upon what masters see at night." New England Maritime Co. v. U. S. (D. C.) 55 F.(2d) 674.

As no cause for the collision is found other than the fault of the submarine, it follows that the decree must be in favor of the vessel having the right of way, in this case for the libellant. An assessor will be appointed.