### THE CUTLER.

### THE JULIUS H. BARNES.

### THE CALATCO NO. 2.

District Court, S. D. New York.

March 7, 1944.

Bigham, Englar, Jones & Houston, of New York City (Charles A. Van Hagen, Jr., of New York City, of counsel), for libellant Southern Transportation Co.

Dow & Symmers, of New York City (Wilbur E. Dow, Jr., and Sherman V. Petrie, Jr., both of New York City, of counsel), for claimant Erie & St. Lawrence Corporation.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for claimant Canal Lakes Towing Corporation.

LEIBELL, District Judge.

These two suits in admiralty, arising out of a collision in New York bay in the vicinity of Robbins Reef, were tried together. At the end of the trial I expressed the view that both the tug "Calatco No. 2" and the M/V "Julius H. Barnes" were at fault and that the damages should be divided. There was no fault on the part of the barge. The M/V "Barnes" sustained damage to her plates and deck when her port side, a little forward of midship, came in contact with the bow of the barge "Cutler," which was in tow alongside of the tug "Calatco No. 2." The bow of the barge was damaged above the water line. The tug was undamaged.

The "Barnes" was a modern Diesel-engine vessel, with twin screw propellers, two rudders, and a hull designed to carry cargo in bulk. She had the Sperry electric type of steering gear, which can be operated from the wheelhouse or from either end of the bridge. On December 10, 1942, she left Pier 6, East River, New York City, at 5:36 P.M. bound for the Marine Maintenance Shipyard, at Bayonne, New Jersey. Captain Atkinson was on the monkey bridge, a platform over the pilot house. The helmsman was inside the wheelhouse. A lookout was on the port wing of the bridge. The third mate was at the starboard end of the bridge. The vessel was in water ballast, with a draft of 3 feet for-

ward and 9 feet 6 inches aft. She proceeded through Buttermilk Channel, which separates Governor's Island from the Brooklyn shore, and at buoy No. 30, at the north end of Red Hook Flats, she turned a bit to port to follow a course about parallel with the easterly side of the channel, leading towards Staten Island and the Kills. She passed buoys No. 28 and No. 26 about 300 feet off, and at the latter buoy she changed her course so as to head diagonally across the channel towards the flashing green light and gong buoy No. 27, which marks the southeast corner of Robbin's Reef, the point at which the harbor channel meets up with the channel leading into the Kills.

Visibility was fair for about two miles. The "Barnes" was showing all lights, colored sidelights, a masthead light, range lights, and some deck lights, three or four on either side. All her lights were electric with a double circuit and an alarm buzzer. The vessel was equipped with a good whistle—an air whistle located at the forward starboard corner of the wheelhouse. She had been travelling at full speed, about 8½ knots, and was favored by an ebb tide of 1½ miles, or at about 10 knots over the ground.

The tug "Calatco No. 2," with the seagoing coal-barge "Cutler" on her starboard side, had left Perth Amboy about 12:45 P. M. that day, December 10, 1942, on a voyage through the Kills to New York bay. The "Cutler," a wooden craft, was 230 feet long, 37 feet wide, 19 feet deep and had a pointed bow. She was loaded with 1987 tons of coal and was held alongside the tug "Calatco No. 2" by a headline, a towline and a stern line. The tug was about 82 feet long. The pilot house of the tug was about 8 to 10 feet above the barge and about 20 feet forward of the pilot house of the barge, which was located aft. The bow of the barge projected about 150 feet beyond the bow of the tug. The stern of the barge was about even with the stern of the tug. A towing strap ran from the side bitt of the tug to the stern side bitt of the barge; a headline extended from the tug to about the center bitt of the barge, and a stern line from the stern bitt of the tug to the main stern bitt of the barge. There probably was another line from the main bitts on the bow of the tug to a bitt right abreast of them on the barge.

The tug and her tow came out of the Kill Van Kull about 5:45 P. M. As they headed in the direction of the Bay, they were showing all proper lights. The tug displayed both colored side lights, a white head light and two white lights on the staff (all electric). The barge had a white light on her bow, another on her stern, and a green side light on her starboard side. * * *

Giving consideration to the probable courses of the "Barnes" and the tow towards their destinations from their respective turning points, 300 feet off buoy No. 26 and 1000 feet south of buoy No. 27, it is my opinion that these vessels were about a half mile apart when the "Barnes" blew her first one-blast and that they both were going full speed ahead; that the "Barnes" was making about four times the speed of the tow over ground; that the "Barnes" was about 650 yards on her course from buoy No. 26 when she blew her first one-blast and the tow was about 300 yards east and slightly south of buoy No. 27; that the collision occurred at a point about 500 yards due east of buoy No. 27; that between the time of her first blast and the collision the "Barnes" travelled about 825 yards and the tow about 225 yards; that the "Barnes" did not blow her second one-blast until the vessels were about 400 yards apart.

Captain Atkinson testified that when he got no answer to his second one-blast he stopped both engines and righted slightly. At that time he considered that there was danger of collision. He then took over himself and put the helm further to the right, a couple of degrees. He was making these changes in his course, he said, pursuant to Article 27 of the Inland Rules, 33 U.S.C.A. § 212, which permits a departure from the rules "in order to avoid immediate danger." He claimed that his was the privileged vessel since he was on the tug's starboard. If so, he was required to hold his course and speed (Inland Rules Art. 21, 33 U.S.C.A. § 206), if there was no danger of collision. The single blast of the "Barnes" had signified her intention to hold her course and speed. He says he did neither because he was then acting under Article 27 to avoid immediate danger. If in his opinion the danger was that immediate he should have blown a danger signal and three, and put the engines full speed astern. If her engines had been put in reverse promptly the "Barnes" could have been brought to a stop in about 900 feet—three lengths.

From his own testimony it would appear that he was then content with the half way measure of stopping his engines. If he had promptly reversed his engines and had blown a danger and a backing signal, the tug would have been informed that the "Barnes" considered the situation dangerous, that the "Barnes" could not hold to her course. Her second one-blast signal indicated that she could. The master of the "Barnes" was in a better position at the time to know what his own vessel could do; he knew her speed and maneuverability. If he had any doubt about the safety of his proposed course, surely, the tug, with a heavily laden coal barge alongside, was entitled to know it. * * *

It appears to me from the story of Captain Atkinson that he unnecessarily crowded this heavily-laden tow; that he closed in at such a speed that he was unable to extricate himself when he finally realized that he could not cross the bow of the barge; that he then went into reverse and by swinging his bow to starboard brought his stern into a position of imminent contact with the barge; that in an attempt to clear, he ordered full speed ahead on his starboard engine and put his helm hard to port to swing his bow sharply to port. According to the third mate, the "Barnes" and the tug were less than a quarter mile apart when the second one-blast signal was blown by the "Barnes." The captain testified that they were about half a mile apart at the time, but in that he must be in error. Whatever the distance, admittedly he continued to come on, veering his course only slightly to starboard, and stopping his engines, according to his testimony. He should have gone full speed astern and kept away.

The maneuver that precipitated the collision was made by Captain Atkinson when he put the engines of the "Barnes" in reverse and swung her bow toward starboard. He testified that this was only for a few seconds; but the effect of the maneuver was to swing the stern of the "Barnes" towards the bow of the barge "Cutler." The tug promptly blew a danger signal. The captain of the barge happened to come out on the deck of the scow from the donkey engine room up near the bow, and he "saw this vessel, this motorship coming down on the bow, or trying to cross the bow of my barge"—off the starboard. He testified: "As she came closer she looked like she was swinging her bow to starboard trying to clear, but he saw he couldn't clear, saw his stern was going to hit so he changed his course to swing his bow to the port and swing his stern to starboard so as to clear without doing any more damage after he hit." But "the port side of the motor ship came down into the bow of the 'Cutler.' "

The action of the tug in blowing a danger signal was justified. There is an issue as to whether or not the tug added two blasts. If the tug added two blasts, she thereby announced her intention to go to port. Under the circumstances there was no fault in this. The "Barnes" was in reverse, her bow was going to starboard and her stern was swinging down towards the bow of the barge. The tug captain may have thought that by going to port—bringing the bow of the barge to port—he might get it out of the way of the swinging stern of the "Barnes." His lookout on the bow of the barge shouted to him to "go back." It was probably when he saw the "Barnes" change her maneuver so as to swing the bow of the "Barnes" to port that he decided to go into reverse, which he did. At the time it would seem a better maneuver on the part of the tug than going to port would have been. * * *

Hereinabove I have shown that if we assume, arguendo, that the captain of the "Barnes" stopped his engines soon after blowing his second one-blast signal, as he said he did, he was not obeying the rule requiring the privileged vessel on a crossing situation to hold her course and speed. Article 21. I shall now consider the conduct of the "Barnes" assuming that she continued at full speed after she had blown her second one-blast signal. Her captain admitted that he then took over the steering of the vessel and considered that there was danger of collision. He says that the tug appeared to be continuing on her course. The vessels were approaching each other. If he failed to understand the course or intention of the tug, he should have immediately signified the same "by giving several short and rapid blasts, not less than four of the steam whistle." Art. 18, Rule III, 33 U.S.C.A. § 203. Risk of collision can "be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist." Inland Rules-Prelimin-

ary, 30 Stat. 96. The tug, according to all the witnesses, did not change her course. The obligation on the privileged vessel in a crossing situation to keep her course and speed does not apply when to do so "is likely to result in disaster." The Senator Rice, 2 Cir., 223 F. 524, 527. "Over and underlying all the rules of navigation is that rule of common sense, so often referred to, that no one has the right to run into collision. That one vessel is obviously at fault does not justify another in running down her or her tow; a navigator may see how wrong another is, yet he must still avoid collision, if he reasonably can." The George S. Tice, 2 Cir., 287 F. 127, 129. "It must always be remembered that it is the risk of collision, not the collision itself, that masters must avoid." Ocean S. S. Co. v. United States, 2 Cir., 38 F.2d 782, 784. The privileged vessel may not hold her course and speed after it becomes evident that the burdened vessel either cannot or will not keep out of the way. The Fulton, 2 Cir., 54 F.2d 467. This second circuit in Postal S. S. Corp. v. Southern Pac. Co., 112 F.2d 297, 298, in referring to the privilege of the holding on vessel when faced with a cross-signal from the giving way vessel, stated: "The interest of the holding-on vessel in holding her course and speed is nil; she is called upon to surrender nothing of substance, compared with the overshadowing interest of avoiding collision, or danger of collision," and the court held that even though the other vessel was far more gravely at fault the court could not apportion damages—that the damages would be divided.

■ There is not much that I need add to my comments on the fault of the tug, as expressed on the record at the end of the trial. It was the tug's duty to answer promptly the two one-blast signals of the "Barnes." She did not do so. It was also the duty of the tug in this crossing situation, where she had the "Barnes" on her own starboard to "keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse." Inland Rules 312.7, 9 Code of Fed.Rep. p. 503, and Art. 19, 33 U.S.C.A. § 204. Further, the lookout from the tug, stationed at the bow of the barge, was not doing his job. I think he should have seen the "Barnes" sooner than he says—when she was about

450 feet away. The excuse of an intervening ferry boat is highly improbable.

In discussing the fault of the "Barnes" at the end of the trial I stated in substance that the Captain of the "Barnes" put his vessel in a position of danger unnecessarily; that when he saw that there was no actual signal from the tug, he could have reversed his own engines and gotten out of the way; that if he had taken proper precautions he could have avoided the accident. I thought that the Captain of the "Barnes" had seen the tow in plenty of time; that he could discern the nature of the tow, its speed and its direction. The "Barnes" was in ballast, a light craft. There was plenty of water for her, not merely in the channel but on either side. It seemed to me then that there was plenty of room for the "Barnes" and that she should have kept away. The captain's explanation of why he let himself get so close to the tow was: "After blowing the one I did not think it was advisable to cross (cross his own signal)." But he could have signaled the tug his failure to understand her course or intention. He could have hauled off himself, kept closer to the buoys on the left of the channel and slowed down so as to pass around the tow. He admitted as much: "It would have been altogether proper." What is more important it would have been safer. As Captain Atkinson put it, "there was plenty of room for both of us." There was no excuse for his crowding the tow.

■ A few days after the trial I received a letter from counsel for the "Barnes" asking for further argument, because he felt that I had not pointed out anything that showed any fault on the part of the "Barnes." I received further briefs and I have made a careful study of the testimony and the exhibits. I am still of the opinion that both the "Barnes" and the tug "Calatco No. 2" were at fault and that the damages suffered by the barge "Cutler" and by the "Barnes" should be divided between the "Barnes" and the tug "Calatco No. 2." I am filing herewith Findings of Fact and Conclusions of Law.

An interlocutory decree should be entered holding the M/V "Julius H. Barnes" and her claimant, Erie & St. Lawrence Corporation, and the tug "Calatco No. 2" and her claimant, Canal Lakes Towing Corporation, jointly and severally liable for the damages sustained by the barge "Cutler", and holding the tug "Calatco No. 2"

and her claimant, Canal Lakes Towing Corporation, liable for one half the damages sustained by the "Barnes" as a result of the collision.