## UNITED STATES v. WOODBURY.

No. 4378.

United States Court of Appeals
First Circuit.

July 5, 1949.

Before MAGRUDER, Chief Judge, and CLARK (by special assignment) and WOODBURY, Circuit Judges.

Leavenworth Colby, Special Assistant to the Attorney General (H. G. Morison, Assistant Attorney General, William T. McCarthy, United States Attorney, Boston, Mass., J. Frank Staley, Special Assistant to the Attorney General, and John T. Casey, Attorney, Department of Justice, of Washington, D. C., and Edward O. Gourdin, Assistant U. S. Attorney, Boston, Mass., on the brief), for appellant.

Alfred W. Howes, Boston, Mass. (William J. Fitzgerald, of Boston, Mass., on the brief), for appellee.

WOODBURY, Circuit Judge.

This is an appeal by the United States from a final decree in a cause of collision civil and maritime brought under the Public Vessels Act, 43 Stat. 1112, 46 U.S.C.A. § 781 et seq., awarding the libellant as damages the full value of a dragnet destroyed by the United States submarine Sea Owl, plus $250 on account of loss of gross profits for the period of inactivity enforced upon the libellant's vessel by the loss of her fishing gear.

The following facts may be taken as fully established by the undisputed testimony, the findings of the District Court adequately supported by evidence, and the concessions of counsel.

On the morning of May 9, 1946, the libellant's dragger Ariel, and several other fishing vessels of the same type, were engaged in dragging for fish off the coasts of Massachusetts and New Hampshire in what is known as Ipswich Bay. The weather was fair, the sea smooth and the visibility clear. On the same morning the United States submarine Sea Owl, proceeding on orders and escorted by the United States submarine rescue vessel Falcon, was conducting routine diving tests following a general overhaul, in that part of Ipswich Bay south and slightly west of the Isles of Shoals delineated on United States Coast and Geodetic Survey Chart No. 1206 in purple and designated "Area D." This area is concededly within inland waters as defined by the Commandant of the Coast Guard pursuant to the authority conferred upon him by § 151 of Title 33 U.S.C.A. With reference to it the chart carries the notation: "Limits and designations of submarine operating areas are shown in color. As submarines may be operating in these areas, vessels should proceed with caution. Customarily, advance notice of such operations is broadcast from U. S. Navy radio stations."

The Sea Owl entered Area D from the north soon after 9 a. m. and rendezvoused with the Falcon. After some maneuvering, the Falcon took station 1,000 yards on the submarine's port beam and raised the International Flag Hoist H P, known as "How and Peter", meaning "Submarines are exercising in this vicinity; you should navigate with great caution,"[1] to both yardarms, a height of about 80 feet above

---

[1] International Code of Signals (American Edition) Vol. 1—Visual.

the water. Both vessels then took a course of 180° true, or due south, and at 10:06 the Sea Owl submerged to a keel depth of 60 feet. At 10:25 the Sea Owl surfaced and both vessels reversed course to 000 true, or due north, thereby placing the Falcon 1,000 yards on the submarine's starboard beam, and at 10:43 on this course the submarine submerged again to a depth of 60 feet. At this depth its forward periscope was just awash, its after periscope extended about six feet above the water, and its whip radio antenna, which had failed to retract, extended about 10 feet above water.

At 10:45 the navigating officer of the submarine picked up the Ariel through the after periscope, and observed that she was on an easterly crossing course on a relative bearing of 324 degrees at a distance which the court below found to have been nearly 1,500 yards. Observing that the bearing of the Ariel did not appreciably change, the navigating officer of the Sea Owl notified the captain, and the latter came to the periscope and ordered the Ariel tracked on the submarine's sound gear. The captain realizing that risk of collision existed, ordered the submarine brought up to 50 feet in the hope that by exposing 10 feet of his forward periscope and ten feet more of his after periscope and radio antenna (at this depth no other parts of his vessel's superstructure appeared above the surface) the Ariel would be alerted to the presence of the submarine, and her course and speed, which the court below found was between 4 and 5 knots. After about a minute at this depth, during which the Ariel gave no indication of changing her course, the commanding officer ordered the submarine taken down to a depth of 80 feet and the periscopes retracted, a maneuver which would permit the Sea Owl to pass under the Ariel with ample clearance. The submarine's sound gear tracked the Ariel approaching on the port bow, lost her, and picked her up again receding on the starboard quarter, and a moment later, at 10:50, those on board the submarine heard a banging and scraping sound caused by their vessel's superstructure becoming entangled in the Ariel's dragnet. The submarine was then brought up to periscope depth when it was observed that the Ariel was being towed astern by the cables which attached her to her net.

The latter vessel, towing her net but showing no signal of any kind to indicate that she was trawling, entered Area D from the west approximately half an hour before the collision. During that time she had maintained a constant course a little south of east and a constant speed of about 2½ knots. She was in all respects seaworthy and properly equipped and had a radio on board. Her master was in the pilot house and a lookout was stationed forward both of whom were fully aware of the presence of both the submarine and the Falcon in the area. In fact they had sighted the Sea Owl when she first entered the area and had seen her several times since, the last time as late as about 10:40, three minutes before she dove and ten minutes before the collision. Neither, however, had made any effort to keep the submarine under observation or to keep a constant check on her position, and neither was aware of her immediate proximity before the collision. Nor had either of them observed the signals being flown by the Falcon, the lookout frankly admitting that he had not seen the Falcon's signals because he had not looked.

As a result of the entanglement of the submarine in her net the Ariel was snubbed short and the wires attaching her to the net had to be cut to avoid running up on the submarine's deck when it came to periscope depth after the collision.

On the basis of the foregoing facts, plus findings that it was customary in the area for either the submarine or its escort vessel to come within hailing distance of fishing vessels and warn them whenever they might be endangered by the maneuvering of a submarine, and that it was usual in the area for the escort vessel to remain constantly between the submarine and fishing vessels, the court below attached sole fault for the collision to the Naval vessels and entered its decree accordingly.

The Government challenges this decree on four grounds. It says that the Ariel as the burdened vessel in a crossing situation violated the statutory rules for preventing collisions at sea; that the Ariel

did not have an attentive lookout; that the Ariel failed to display any signal that she had her gear out as required by good seamanship and the rules of the road; and that the Ariel had not established that her statutory violations not only did not but could not have caused the collision.

■ There can be no doubt that a submarine is a "vessel propelled by machinery", and hence that it is a "steam vessel" as defined in both the International and the Inland Rules of navigation. 33 U.S.C.A. §§ 62, 155. Thus it has been held that a submarine when operating on the surface is subject to the rules of navigation with respect to rights of way including the "starboard hand" rule embodied in identical language in article 19 of both the International and the Inland Rules. 33 U.S.C.A. §§ 104, 204. Ocean S. S. Co. of Savannah v. United States, 2 Cir., 38 F.2d 782; Black v. United States, D.C., 8 F. Supp. 443, affirmed sub. nom. United States v. Black, 1 Cir., 82 F.2d 394. Indeed in these cases it was also held that the rules of navigation relating to the position of running lights and the rule requiring a lookout on the forward part of vessels under way applied to submarines on the surface even though the peculiar construction of such vessels made literal compliance with those rules difficult if not impossible. But the holdings in the above cases do not point to the conclusion that the rules of navigation with respect to rights of way in crossing situations apply to submarines when operating submerged. Although we are not aware of any authority squarely in point, we are clearly of the view that the latter rules of navigation can have no application to a submarine operating below the surface for the reason that those rules rest upon the presupposition that the vessels involved can be aware of one another's presence and can keep a continuous check upon each other's position. Without an opportunity to know of one another's presence, maneuvering to avoid risk of collision is impossible for when vessels are on crossing courses, "one is selected which must 'keep out of the way' of the other, and the

other is held rigidly to her course and speed, in order that the first shall be able to forecast the second's future positions, by which alone the first can do her duty." Lind v. United States, 2 Cir., 156 F.2d 231, 233; United States v. The Australia Star, 2 Cir., 172 F.2d 472, 475. Hence we conclude that the starboard hand rule is inapplicable when the vessel on the normally holding-on course is running submerged and the one on the normally giving-way course is on the surface. Instead we think it clear that the operation of a vessel below the surface where she cannot be seen and cannot give visual or audible signals, creating as it obviously does manifest "dangers of navigation and collision" not only to herself but to other vessels in the vicinity, constitutes a "special circumstance" which renders departure from the ordinary rules of the road at sea "necessary in order to avoid immediate danger" and thus invokes the so called "special circumstances" rule embodied as to inland waters in article 27 of the Inland Rules quoted in the margin.[2] 33 U.S.C.A. § 212. And we think that application of this latter rule requires the submerged vessel to "keep out of the way" of the surface vessel regardless of their respective courses for in the very nature of the situation the ordinary surface vessel cannot know or be expected to know of the submarine's presence, whereas the latter with her periscopes and sound gear can not only know that a surface ship is in the vicinity but can also determine that vessel's course and speed.

■ Furthermore we think the "special circumstances" rule instead of the "starboard hand" rule applies to the navigation of a submarine even when it is not operating wholly submerged but is operating with both periscopes and a whip radio antenna showing above the surface. We say this because we cannot but be aware of the fact, indeed it appears in the record, that such projections on a submarine are purposely made as small as possible in diameter in order to render them inconspicuous, and so they will show only a little wake, to the end that they will escape detection by an

---

[2] "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

enemy and, if detected, will make the speed and course of the submarine difficult to determine with accuracy.

In short it seems to us that a submarine, operating as the Sea Owl was operating during the seven minute interval preceding her entanglement in the Ariel's net, is analogous to a surface vessel operating blacked-out at night as far as visibility is concerned. That is to say, we think it is just as difficult to see the periscopes of a submarine in the daytime as it is to see a blacked-out surface vessel at night. Therefore we regard as in point the Lind and Australia Star cases, supra, in which it was held, applying the "special circumstances" rule, that a blacked-out vessel, although on a normally holding-on course, is required to "keep out of the way" of a lighted vessel, although on a normally giving-way course, for the reason that it is "substantially impossible" for those on the lighted vessel to see the unlighted one very far away, and even if they should see her, to make out her course and speed, and for the further reason that the navigator of the lighted ship, knowing that his vessel could be plainly seen, would be "justified in supposing" that the navigators of the unlighted ship would shape the course of their vessel to avoid him, since they would know that their vessel could not be seen or anything done to avoid a collision with her until she was close at hand.

From this it follows that the failure of those on the Ariel either to observe the Sea Owl or to read the signals on the Falcon, if imprudent navigation, was immaterial, for the respective roles of the vessels being reversed, it was not only the privilege but the duty of the navigators of the Ariel to maintain their course and speed in the expectation that their vessel would be seen by the navigators of the Sea Owl, and that the latter, knowing all that they did and realizing that their vessel could not, or probably would not, be seen and traced, would deflect the course of their vessel to avoid a collision. Thus although those on the Ariel may have been inattentive, the navigators of that vessel in fact took the safest course open to them, for even if they had been aware of the approaching submarine they would have known that any act of attempted avoidance on their part would be likely to result in maneuvering at cross purposes. Therefore theirs was the navigation demanded by the situation, and "The fact that the prudence of their navigation was unwitting, does not make it any the less prudent navigation; we cannot hold them for the performance of their duty, however little they may be entitled to credit for performing it." Lind v. United States, supra, 156 F.2d 234.

It does not follow as a necessary consequence of the reversal of the respective roles of the vessels, however, that the Sea Owl was clearly at fault for holding her course and speed as she approached the Ariel. Being a submarine she could perform her duty to "keep out of the way" of the Ariel by diving under her; the maneuver she undertook, and one which would have been entirely successful had it not been for the net the Ariel had in tow. The question is whether the commander of the Sea Owl ought to have reckoned on the possibility that the Ariel's gear was out and hence concluded that diving under her involved risk of collision with her net.

It is contended on behalf of the Ariel that her slow speed (2½ knots) gave clear warning that she was towing her net, since fishing vessels seldom if ever trawl at speeds in excess of 3 knots, and would have no occasion to move at such a slow speed unless they were trawling, and hence should have informed those in charge of the Sea Owl of the risks of the maneuver they undertook and caused them instead either to slow down or to turn aside, which they had ample time to do after they observed the Ariel's adherence to course and speed in apparent oblivion of the Sea Owl's presence.

The captain of the submarine, however, testified on deposition that he estimated the Ariel's speed to be about 5 knots, and from this estimate of her speed and the fact that she was not showing any signal whatever to indicate that she was engaged in trawling, he assumed that her nets were not out and therefore concluded that it was safe for him to take his vessel under the Ariel.

Perhaps the liability of the United States might be predicated upon the failure of

either the Sea Owl before she submerged or the Falcon to follow the custom prevailing in the area to approach and warn fishing vessels by voice whenever submarines endangered their activities. And perhaps the failure of the Falcon to follow the usual practice in the area for escort vessels to take a position between a maneuvering submarine and fishing vessels might also provide a basis for holding the United States at fault for the collision. Perhaps also either the captain of the Sea Owl or the captain of the Falcon ought to have attempted to give the Ariel seasonable warning by radio, or the captain of the Falcon should have shown some more imperative visual signal than the International flag hoist "How and Peter". His abortive attempt to attract the attention of the Ariel to her impending danger by flashing the search light of the Falcon at her came too late to be effective even if the light had been seen and its meaning understood by those on the Ariel. But we do not need to decide these questions because however we might decide them we would nevertheless have to conclude that the United States was liable, for we agree with the District Court that the captain of the submarine in the exercise of due care should have realized from his observation of the Ariel that she was a fishing vessel with her gear out and hence should have appreciated the danger of diving under her. The question remains, however, whether the Ariel was not also at fault for the collision because of her failure to fly any signal that she was trawling.

The Government contends that the Ariel was clearly at fault in this respect because of her failure to comply with Pilot Rule 312.18 adopted by the Board of Supervising Inspectors on January 20, 1915, and approved by the Secretary of Commerce on April 12 of that year. This rule, which counsel have agreed was in force at the time of the collision in the form in which it appears on page 30 of the Edition of May 28, 1940, Series No. 16 of the "Pilot Rules for Certain Inland Waters of the Atlantic and Pacific Coasts and of the Gulf of Mexico", published by the United States Department of Commerce, Bureau of Marine Inspection and Navigation, is entitled "Rule for Signals to be Displayed by a Towing Vessel when Towing a Submerged or Partly Submerged Object upon a Hawser when no Signals are Displayed upon the Object which is Towed". In so far as material here it reads: "The vessel having the submerged object in tow shall display by day, where they can best be seen, two shapes,[3] one above the other, not less than six feet apart, the lower shape to be carried not less than 10 feet above the deck houses."

■ Verbally this rule would seem clearly to apply to fishing vessels when towing their nets in the daytime. But it appears in the above publication as Rule 1 of a series of 15 rules promulgated at the same time under the general title of "Rules for Lights and Day Signals to be carried by Vessels, Dredges of all Types, and Vessels Working on Wrecks or other Obstructions to Navigation, or Moored for Submarine Operations or Made Fast to a Sunken Object which may Drift with the Tide or be Towed", and the only types of vessels specifically mentioned in any of the rules in the group are dredges, derrick boats, lighters, vessels laying under-water pipes or cables, floating plants, etc. Read in its context, and having in mind the specific rules with respect to the signals to be made by fishing vessels found in both the International and the Inland Rules, to which we shall presently refer in some detail, we think the above Pilot Rule was not intended to have any application to fishing vessels, and would not reasonably be understood by any one reading it as having any application to such vessels. On the contrary, we think the above rule, considered in its context and with reference to the specific provisions with respect to fishing vessels appearing in both the International and Inland Rules, was obviously intended only to apply, and would be read as applicable only to, vessels engaged in salvage operations, under-water construction or repairs, and like activities.

---

3 The rule provides that "the shapes shall be in the form of a double frustrum (sic) of a cone, base to base," of specified colors and dimensions.

The Government further contends, however, that in spite of the total absence of any inland rule requiring fishing boats to show any daytime signal whatever to indicate when they are engaged in trawling, although there are inland rules specifying the lights such vessels are to make when so engaged at night, article 9(k) of the International Rules, 33 U.S.C.A. § 79(k), quoted so far as material in the margin,[4] applies in inland waters by virtue of the first preliminary paragraph of the International Rules, 33 U.S.C.A. § 61, to the effect that those rules, although applicable not only upon the high seas but also in all waters connected therewith navigable by seagoing vessels, "shall not apply to the harbors, rivers and inland waters of the United States, * * * in so far as special rules are adopted in pursuance of article 30." The argument is that since no special rule as to daytime signals for fishing vessels when engaged in trawling was ever adopted for inland waters pursuant to the reservation of power to do so in article 30 of the International Rules, 33 U.S.C.A. § 131, article 9(k) of these rules becomes automatically applicable in inland waters by virtue of § 61 above. We do not agree.

We are at a loss to understand the apparent hiatus in the Inland Rules caused by the failure to provide therein for daytime signals for vessels engaged in trawling. Nevertheless it seems to us that when Congress enacted the Inland Rules it intended to establish a comprehensive set of rules for inland waters. Else why did Congress see fit in many instances to repeat the international rule for a given situation, sometimes verbatim as in the crossing situation we have considered, in the Inland Rules which it established pursuant to the authority to make such rules contained in article 30 of the International Rules? We cannot believe that the drafters of the Inland Rules copied certain of the International Rules, and left others out, with the understanding that those omitted were to have the same force and effect as those included. Furthermore, if the International Rules were intended to apply in inland waters in the absence of a specific inland rule, there was no need whatever for such a comprehensive set of inland rules as Congress provided. It would have been enough merely to supplement the International Rules by providing inland rules to cover only those situations calling for peculiar treatment in inland waters, leaving the International Rules to apply in inland waters ex proprio vigore to all other situations.

Although authority in point seems to be scanty, the Government cites no cases to support its contention and we have found none, the result we have reached is supported by a note appended to the comparative presentation of the International and the Inland Rules in 6 Benedict on Admiralty (6th Ed.) 367, in which it is stated "The International Rules apply on the high seas. Their permissible effect in American inland waters has been wholly nullified by the enactment of the statutory Inland * * * Rules * * * pursuant to the authority granted by Article 30 of the International Rules." We therefore are of the view that Congress in enacting the Inland Rules must have intended to establish a full and complete set of rules for inland waters, and hence we conclude that when Congress omitted to provide any signal for a given situation occurring in inland waters it meant to require no signal for that situation in those waters even though a signal was required therefor in international waters.

It does not follow, however, that the Ariel was free from fault in flying no signal whatever to indicate the activity in which she was engaged at the time and place of the collision, for mere literal compliance with a specific rule of navigation is not always and under all circumstances enough to exonerate a vessel from fault. This is so for the reason that article 29 of the Inland Rules, 33 U.S.C.A. § 221, which although general in its language is just as much a statutory command as the rules couched in more specific terms,

---

[4] "All vessels or boats fishing with nets or lines or trawls, when under way, shall in daytime indicate their occupation to an approaching vessel by displaying a basket or other efficient signal where it can best be seen."

provides in pertinent part: "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry * * * signals * * * or * * * neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

This rule requires, in addition to bare compliance with the literal provisions of some specific rule, the adoption either of such additional precautions as it is the ordinary practice of seamen to take in a particular situation, or of such additional precautions as the special circumstances of a particular case reasonably demand. As the Supreme Court said in The Oregon, 158 U.S. 186, 201, 15 S.Ct. 804, 810, 39 L. Ed. 943, the rules are "supposed to make provision for all ordinary cases," but "Undoubtedly, where the circumstances of the case are such as to demand unusual care, such care should be exercised." [5]

 We have no basis for any conclusion whatever with respect to the ordinary practice of seamen when trawling in a designated submarine maneuvering area in which it is known that submarines are actually operating. But we think that trawling in such an area, knowing that submarines are actually exercising therein, constitutes a special circumstance reasonably calling for the exhibition by the fishing vessel of some appropriate signal to warn the submarine of the peril to which she is exposed by the submerged net. And an appropriate signal to fly would be the basket called for by International Rule 9 (k) above, for the meaning of that signal is clear, and could not be mistaken in inland waters, since it is not specified for any other situation in those waters. Indeed in a publication of the United States Coast Guard introduced into evidence at the trial entitled "Comparative Rules of the Road and How to Obey Them," the basket signal

of the International Rules is set out as proper, although not required, for fishing vessels with nets out making way in inland waters navigable by seagoing vessels. Under the foregoing circumstances we think the Ariel, although not at fault for engaging in trawling in the area at the time when the collision occurred, was at fault for doing so without displaying any signal of any kind to warn the submarine, which she knew was operating not only in the area but in her immediate proximity, of the activity in which she was engaged. In brief, we think, the admonition on the chart to "proceed with caution" in the area where the Ariel was fishing at the time of the collision, coupled with the fact that to the knowledge of those on board her a submarine was actually operating in the area at the time, constituted a special circumstance requiring the Ariel, if she is to be exonerated, to take the precaution of exhibiting a basket, or some equally effective signal, to indicate her occupation to those on the submarine.

And we think the Ariel's fault was clearly a contributing cause of the collision. Had the captain of the Sea Owl not kept the Ariel under visual observation through the periscope, but instead had only tracked her on his sound gear, it would be clear that the Ariel's failure to fly any visual signal could not be found to have been a contributing cause of the collision. But the navigators of the submarine had the Ariel under close visual observation before the collision, and while they miscalculated her speed, and hence misunderstood her occupation, it is hardly conceivable that they would not have seen, and seeing heeded, a signal by her that her gear was out, and governed their navigation accordingly. We cannot say that because the captain of the submarine did not observe the Ariel carefully enough to make an accurate estimate of her speed, that he would have failed to see and heed a visual signal flown

---

[5] For an application of this principle by a district court in a situation much like ours see The H. S. Beard, D.C., 134 F. 648, in which two tug boats in New York harbor towing a submerged scow which could hardly be seen and which moved on an erratic course, were held partially at fault for a collision between the scow and another vessel on the ground that they were negligent for failure to place a signal on their tow, or to give some other appropriate warning of its presence, although at that time (1904) there was no rule comparable to Rule 312.18, supra, in existence.

in her rigging. On the contrary we think there can be little doubt that had the Ariel flown an appropriate signal the captain of the submarine would not have taken the course he did.

It follows that the rule of divided damages applies.

The decree of the District Court is set aside and the case is remanded to that court for the entry of an appropriate decree.